## THE PEMAQUID.

### (District Court, D. Maine, S. D. November 21, 1918.)

### No. 436.

1. **COLLISION** ⊚100(2)—**STEAMERS MEETING IN FOG—EXCESSIVE SPEED.**

   A collision between two steamers meeting in a narrow channel in a dense fog *held* due to the fault of one for immoderate speed, proceeding on the wrong side of the channel, and failure to stop on hearing the whistle of the other vessel ahead, all in violation of the navigation rules.

2. **COLLISION** ⊚82(1)—**NAVIGATION RULES—"MODERATE SPEED" IN FOG.**

   Under the rule requiring moderate speed in fog, vessels are bound to reduce their speed to such a rate as will enable them to stop in time to avoid a collision after the approaching vessel comes in sight, providing she is herself going at such moderate speed.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Moderate Speed.]

3. **COLLISION** ⊚82(2)—**STEAM VESSELS IN FOG—FAULT.**

   A steamer which before she came in sight, in a fog, of a meeting vessel, which she knew was approaching, had stopped and reversed, and was actually going astern at the time of collision, cannot be held in fault because of her previous speed.

4. **COLLISION** ⊚80—**NAVIGATION IN FOG—CONSTRUCTION OF RULE.**

   Under the rule requiring a vessel in a fog on hearing another, apparently forward of her beam, "the position of which is not ascertained," to stop, ascertaining of the position of the other vessel need not necessarily be by sight, and when she knows such vessel, the locality, and her usual and proper course, she is justified in navigating accordingly.

---

⊚For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

. In Admiralty. Suit for collision by Calvin Austin, receiver, owner of the steamer J. T. Morse, against the steamer Pemaquid. Decree for libelant.

Edward S. Dodge, of Boston, Mass., and Benjamin Thompson, of Portland, Me., for libelant.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for claimant.

HALE, District Judge. The libelant seeks to recover damages sustained by his steamer, J. T. Morse, in consequence of a collision with the steamer Pemaquid, which took place, in a thick fog, on September 8, 1915, at about 8 o'clock in the morning, near Field Ledge Buoy No. 15, at the western entrance of Deer Island Thoroughfare.

The Pemaquid is a single screw steamer of a burden of 409 gross tons; she is 132.5 feet long, 28 feet beam, and capable of a speed of about 11 or 12 knots. At the time of the collision she was drawing about 9 feet. She was owned and operated by the Maine Central Railroad, and was engaged in carrying passengers and freight between the ports of Sargentville and Rockland.

[1] At about 7:48 o'clock on the morning of the 8th of September, 1915, the Pemaquid left her landing at Stonington with the intention of proceeding westward, out through the western entrance of Deer Island Thoroughfare, running by schedule, on her regular passage, to make the train at Rockland. After leaving the Stonington wharf, she proceeded on her usual course, west, ¾ south, to pass between the buoys on Allen's Bar. She was then put on a course, west ⅞ south, for Field Ledge Buoy, which is about a mile and a quarter from the Stonington wharf.

Capt. Wescott, master of the Pemaquid, testifies:

That, after they left Stonington at 7:48, they proceeded at full speed ahead; they made Allen's Bar in four minutes; from there the run to Field Ledge Buoy is three and three-quarter minutes; from Field Ledge Buoy to Mark Island is about the same; they usually slow down at Allen's Bar for forty seconds to get a departure; here they heard the three whistles of the Morse at Mark Island; he knew she was coming on through the Thoroughfare, and that the vessels would meet and pass at about Field Ledge Buoy; after slowing down, he came ahead at full speed of ten and one-half or eleven knots; he continued at full speed for a minute and a half or two minutes, before he gave the order to slow; then he gave one bell, and that was possibly two and one-half minutes before the collision, though he kept no record at the time; he was steering for Field Ledge Buoy, and he should not consider it safe to go on his voyage without making it; he had never done so; he did not think he could have safely laid his course farther to starboard; if he had gone too far to starboard, he would not see the buoy in the fog; he thinks the channel is two hundred to three hundred feet wide; the buoy is a black, spar buoy, and sticks up out of the water probably twelve feet, and is eight inches in diameter; they have to navigate sixty to seventy feet from the buoy; he had heard the Morse's whistle forward of the Pemaquid's beam, and knew she was coming for the buoy, and that she would be well over on the starboard side of the channel; he was not in the habit of slowing his ship for the Morse to pass, and of course he did not do it; he sighted the Morse very nearly ahead, and perhaps two hundred feet away; immediately upon the Morse breaking out of the fog, he gave three bells, and stepped back and told the quartermaster to put the wheel hard aport; he had just got it hard aport before the collision; he does not know at what speed the Pemaquid was proceed-

ing at the time of the collision, but his best estimate is two or three or four knots.

Eaton, the lookout, testifies:

That he went on watch at Stonington on the bow of the Pemaquid; he was the only man on the bow; the captain and quartermaster were in the pilot house; he reported the position of the Morse once, but made no report of the change in its bearing; he was not the regularly employed bow watchman; he had been on steam vessels three days at the time: before he left his home at Sargentville he had been a farmer, and had run a 21-foot private naphtha boat for summer people; at the time of the collision he had been on the Pemaquid three days; he had been lookout once before on the Pemaquid, namely, the day before the injury; on that day he remained on duty from Brooklin to Stonington, or an hour and a half, and he was on duty possibly ten minutes the day of the collision; he had no other experience as a lookout on a steam vessel; up to the time he sighted the Morse, the Pemaquid's engines had not been moving astern so far as he knew; the only thing that indicated any change was the change in the vibration, and the lessening of the wave at the Pemaquid's bow.

From other officers of the Pemaquid it appears that at the time of the collision the steamer seemed to be going about six or seven knots; that the engine was not stopped until they saw the Morse ahead a second or two before the steamers came together; that the course the Pemaquid was on took them over close to the buoy; that they were then on regular running time, and were pretty nearly over to the buoy when Captain Wescott gave the bell to slow down; that the bow lookout did not report the buoy; that it is uncertain whether the look out saw the Morse and reported her before any one in the pilot house saw her.

Article 16 of the Inland Rules (Act June 7, 1897, c. 4, 30 Stat. 99 [Comp. St. 1916, § 7889]) provides:

"Art. 16. Every vessel shall, in a fog, mist, falling snow, or heavy rain storms, go at a moderate speed, having careful regard to the existing circumstances and conditions.

"A steam vessel, hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained, shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

Article 25 is as follows:

"Art. 25. In narrow channels, every steam vessel shall, when it is safe and practicable, keep to that side of the fair-way or mid-channel which lies on the starboard side of such vessel." Comp. St. 1916, § 7899.

The General Prudential Rule (article 27) is as follows:

"Art. 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger." Comp. St. 1916, § 7901.

On examination of the whole testimony from those aboard the Pemaquid, I can have no doubt that the steamer was proceeding in violation of the statute governing the speed of vessels in a fog. Her immoderate speed is shown, also, by the nature of the blow which she inflicted; for although the Pemaquid had much less weight than the Morse, her speed was such that, when she struck the Morse, she cut into her a distance of 27 feet. The force of this blow can be accounted

for only by the fact that she must have been moving at a rapid rate through the water at the time of the collision.

It is clear from the testimony of the officers of the Pemaquid that, after slowing down at Allen's Bar, and hearing the whistle of the Morse, the steamer continued at full speed on her course for Field Ledge Buoy, and that she kept well over on the port side of the channel, when, as her captain admits, he knew the Morse would keep over on her starboard side of the channel, and would be at Field Ledge Buoy at about the time the Pemaquid would arrive there. No necessity is shown for keeping on the port side of the channel; for the testimony is convincing that at Field Ledge Buoy the channel is two or three hundred feet wide, and there was nothing to prevent the steamer from seeing the buoy at a sufficient distance across the channel to avoid all danger of collision with the Morse.

[2] We must apply the test of the courts that moderate speed implies the ability of a vessel to stop her headway in the presence of danger; that vessels in a fog are bound to reduce their speed to such a rate as will enable them to stop in time to avoid a collision after the approaching vessel comes in sight, providing such approaching vessel is herself going at the moderate speed required by law. The Chatahouchee, 173 U. S. 540, 548, 19 Sup. Ct. 491, 43 L. Ed. 801; The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Sagamore, 247 Fed. 743, 746, 750, 159 C. C. A. 601; The Lepanto, 21 Fed. 651, 659. It is clear, from the proofs, that the Pemaquid was proceeding at an immoderate speed in a fog, and that there were no special circumstances making it necessary for her to depart from the rule relating to speed; that she was navigating on the port, instead of on the starboard, side of the channel; that when she heard the whistle, and knew that the Morse was approaching, she did not reverse until the vessels were practically in collision. She was being navigated, then, in direct violation of at least three requirements of law.

I cannot exonerate her from fault, also, in respect to her lookout. She was navigating at a place and under conditions where an experienced lookout was required. The lookout is the "eyes and ears" of the ship. At the entrance of Deer Island Thoroughfare a ship would not have too many eyes and ears if she had a competent lookout stationed well forward on each of her bows. Eaton, the only man forward, was a man with less than two hours experience as a lookout. He did not promptly notify the navigating officer of the bearing of the Morse when she broke out of the fog. There is no fixed rule as to what constitutes an efficient lookout; but, under all the conditions, I cannot find that the Pemaquid complied with the law in this respect.

Upon the proofs, then, the Pemaquid was acting in flagrant disregard of the safety of the approaching steamer; she was guilty of obvious and inexcusable faults.

The J. T. Morse is a side-wheel passenger steamer, of the burden of 780 gross tons, 199 feet long, 31 feet beam, and 12.1 feet in depth, capable of a speed of from 12 to 14 knots. She was running on her route between Rockland and Bar Harbor. On the morning of September 8, 1915, she sailed from Rockland for Bar Harbor on her regular passage, intending to touch at various intermediate points. She con-

tinued on her voyage until about 8 o'clock, when she entered the western entrance of Deer Island Thoroughfare at Mark Island. Just before this her engine was slowed while passing the steamer Vinalhaven. With this exception she was making her regular full speed. At this point she heard the Pemaquid's whistle and recognized it, and knew that the approaching steamer was bound out through the western entrance of the Thoroughfare, that being the only passage for vessels bound west. She was expecting to meet the Pemaquid there. The fog was thick; the wind a light breeze from the south; the tide about one-half flood; Field Ledge Buoy was five-eighths of a mile ahead, a distance usually run by the Morse in 2½ minutes. The officers of the Morse estimated that the whistle of the Pemaquid indicated her position in Deer Island Thoroughfare "this side", of Stonington Landing. They put their steamer upon her course, E. by N. ⅞ N., to Field Ledge Buoy. No fault is found with her seamanship up to the buoy. She appears to have had two lookouts on her bow; she had a master of experience; a competent pilot; a competent quartermaster at her wheel. Her officers testify that she continued to run, at the same full speed at which she had come across from North Haven to Mark Island, for about two minutes, when her engines were slowed, stopped, and reversed at full speed; that, while she was backing, Field Ledge Buoy came in sight, slowly, on the starboard bow; that when the buoy was about abreast of the Morse, and the steamer was moving astern, the shadow of the steamer Pemaquid was seen in the fog, about half a point on the port bow, and about 400 feet away, and was reported by the port bow lookout; that, when the Pemaquid came in sight, the wheel of the Morse was put hard aport; that the Pemaquid at this time appeared to be swinging toward the Morse on the starboard wheel, and so continued until she struck the Morse at the port gangway, and cut into her two and one-half feet below the water line. Those in control of the Morse insist that, at the time she was struck, she was actually moving astern, and that therefore her speed could not have been a fault contributing to the collision. Much depends upon the determination of this question of fact.

Capt. Addison W. Shute, the master of the Morse, died suddenly in November, 1917, before his deposition could be taken. He testified, however, before the local inspectors soon after the collision:

That about two minutes after he first heard the whistle of the Pemaquid, then about three and one-half miles away; he slowed the Morse and put her in the back gear; his reason for doing this was, "I said I am going to stop and back her; I don't know which way we are going to take her when we find him coming;" that the course of the Pemaquid was "changed before we got to going astern. We got to the buoy, and swung from E. by N. ⅞ N. to E. by N. at the buoy, and we was going astern, and the buoy come right abreast of the pilot house. When we sighted the Pemaquid, she (the Morse) was still heading E. by N. The Morse had gone astern from the time she lost her headway until the collision close on to 400 feet." That his object in going astern was "because I didn't know how we might meet this fellow, and when going astern we could keep out of his way, if we could. The Morse did not swing at all. She backed straight astern." All signals to the engine room were promptly answered. While the Morse was backing, the whistle of the Pemaquid was sounded "a little on the port bow"; and when he first saw her she was a "good half point" on the port bow of the Morse, and appeared to be heading "right straight out by, and would have

gone all right if she had kept on." . That he blew three short blasts of the whistle of the Morse, indicating "going astern full speed by the engines." "At the time of the collision the Morse not only lost her headway, but was going astern about two miles an hour."

### Harry D. Shute, the pilot of the Morse, testifies:

That the course of the Morse was changed, when abreast of Mark Island, from E. by S. to E. by N. 7/8 N. to run to Field Ledge Buoy, five-eighths of a mile away; the usual running time of the Morse from Mark Island to Field Ledge Buoy, in fair weather, is two and one-half minutes; that the Morse continued on that course for two minutes, and then slowed down under "one bell to slow and one to stop, and two to reverse full speed astern"; that these bells were rung half a minute before he saw Field Ledge Buoy: that the reason for ringing them was "to have the boat under control at that time. * * * We knew the Pemaquid was coming, and I imagine that was why he (Captain Shute) put the bells in, to have his boat under control at that point in the channel; * * * to be ready to stop so as to give the Pemaquid a safe chance to go by." The bell signals to the engine room were obeyed and executed promptly. He knows this by hearing the bells over the return tubes from the engine room, and he could tell from the vibration of the boat, and also by Field Ledge Buoy. Just after the two bells for full speed astern were given, he saw Field Ledge Buoy about two points off the starboard bow, and seventy-five to eighty feet away; the Morse ranged ahead until the buoy was about abreast of the pilot house, and then she went back; they got sternway on the Morse; "just as we were backing, I saw the Pemaquid half a point on the port bow, three or four hundred feet away."

### Warren, the port lookout of the Morse, testifies:

That he reported the Pemaquid; Field Ledge Buoy was then bearing just abreast of the pilot house, sixty or seventy feet away; Capt. Addison W. Shute blew the passing signal of one blast of the Morse's whistle, as soon as he saw the Pemaquid, signifying that the Morse would leave the Pemaquid on the port side of the Morse; and the Pemaquid assented by blowing one blast of her whistle. The Morse also blew several blasts to indicate that she (the Morse) was going full speed astern. The course of the Morse had been changed at, or just before, leaving Field Ledge Buoy from E. by N. 7/8 N. to E. by N. to run in over Allen's Bar; but, when the Pemaquid was finally seen, the wheel of the Morse was put hard aport. He thinks that neither the port nor hard aport wheel had any effect on the Morse at that time, but the Pemaquid "appeared to be swinging toward us," on a starboard wheel, and so continued until she struck the Morse at the port gangway and cut into her to two and one-half feet below the water line. The Morse herself was actually moving astern at the time the Pemaquid struck her.

### Addison L. Shute, the son of Capt. Addison W. Shute, testifies:

That he was the quartermaster of the Morse, and in her pilot house with his father and the pilot. Before the Morse reached Field Ledge Buoy, signals were rung by Capt. Shute to the engine room; one, then a second, then another bell with a second, and two bells repeated, making a total of four bells, which meant to back; "I heard the response to the bells in the return tube back of me on the partition;" that these orders were promptly executed; the engines of the Morse were reversed; he knew this by the vibration of the boat, and the white backwater rushing by the bow of the Morse; at the time when the Morse was ranging by Field Ledge Buoy, the engines were moving astern; he was steering, which required pretty close attention to the wheel; it was not until after he had sighted Field Ledge Buoy that he first saw anything of the Pemaquid, and she was then about one-half a point on the port bow of the Morse, and about four hundred feet off. At this time the engines of the Morse were moving astern, and he should say the Morse had stopped and was ranging back at the time "we first saw the Pemaquid come in sight." Capt. Shute blew a passing signal to the Pemaquid, and blew three whistles, meaning that he was backing full speed astern; when

the Pemaquid struck her, the Morse was heading about E. ½ N., and "she was moving back;" there was abundance of room for the Pemaquid to pass without collision when she was first sighted, if she had been properly steered, but she made a "quick turn towards us," and the collision resulted.

The testimony from the engine room is to the effect that the orders to reverse were received and promptly executed, and that the steamer was going full speed astern at the time of the collision. It is not necessary to refer in detail to the other corroborating evidence.

On the other hand, the captain of the Pemaquid, and three others who were aboard the Pemaquid, testify that the Morse was going ahead at the time of the collision. Three of these witnesses did not so testify when they were before the local inspectors. A passenger on the Pemaquid, who thought the Morse was going ahead, bases his testimony upon the fact that he saw white water coming up on the Morse's bow when she first came out of the fog; he feels sure that at that time the Morse was coming ahead and throwing the water up; and there is some other testimony to this effect. This sort of evidence is not of great value, in view of the fact that the Morse was a side-wheel steamer, and that the waves, rolled up in front of her paddle wheels, might readily be taken for a wave upon her bow.

The learned proctors for the claimant base their contention that the Morse was going ahead at the time of the collision, largely upon statements, alleged to be inconsistent, made by the pilot and other witnesses on behalf of the Morse in cross-examination. They also urge that the testimony of the lookout Eaton is important, that when he saw the Morse "she seemed to be moving quite quickly towards us." I am not able to give much weight to the testimony of the lookout, who was a man entirely without experience, and whose whole statements are vague and uncertain. Great stress is laid by the claimant upon the testimony of the pilot, Robinson, who says that, in his opinion, the Morse must have been going ahead at the time the vessels came in collision. His testimony from what he saw is not convincing; his theory that the Pemaquid could not have struck the Morse at the angle she did, if the Morse had not been going ahead, is not, I think, sustained by the testimony. The substance of the claimant's contention is that the Pemaquid had been proceeding under one bell for several minutes prior to the time the Morse had been sighted, at which time her engines were reversed at full speed; and that, while this was not in strict compliance with the pilot rules, it nevertheless was not so contributory a factor to the collision as the movements of the Morse; that the Morse reached the narrow channel at Field Ledge Buoy, in its most dangerous part, while under full speed, 14 knots; and that she had been slowed, stopped, and reversed practically at the same moment. From a careful examination of the testimony on this point, I cannot sustain the position of the claimant. The evidence, taken as a whole, seems to me to sustain the libelant's contention that the Morse had stopped before she saw the Pemaquid, and that she was going astern at the time of the collision. The evidence upon this issue is gathered from 14 witnesses who were aboard the steamer. Their testimony is convincing, and is not materially shaken, in my opinion, by the rigid cross-examination by the learned proctors for the claimant. I cannot escape

the conclusion that the Morse had stopped and reversed before she saw the Pemaquid; that her engines were then running full speed astern; that her hull was moving astern; that she gave to the Pemaquid more than her share of the distance separating the vessels, and enlarged the Pemaquid's space for proceeding down the channel; and that there was room enough in the channel for the Pemaquid to pass, if she had kept upon the starboard side of the channel. Some of the witnesses in behalf of the Morse testify that, when the approaching vessel was first seen, she appeared to suddenly swing toward the Morse instead of away from the Morse. Whether this movement is accounted for by the captain of the Pemaquid, in his confusion, putting the wheel the wrong way, or the Pemaquid failed to answer to her wheel, when reversed, is not made clear and it is not necessary to decide. It is made clear by the proofs that those in control of the Pemaquid were seeking to avoid the starboard side of the channel, fearing that they should lose sight of the buoy at Field Ledge.

[3] Having determined from the evidence that the Morse had stopped and reversed, and was going astern at the time of the collision, it is important to consider at this point, of what, if any, fault the Morse was guilty in reference to speed. She maintained her full speed from North Haven to Mark Island. She could not, however, have contributed to the collision by her speed before she reached Mark Island. If, when she met the approaching vessel, she had already stopped her speed, and was going backward, she ought not to be held in fault for whatever her previous speed may have been. In the Ludvig Holberg, 157 U. S. 60, 67, 15 Sup. Ct. 477, 39 L. Ed. 620, in speaking for the Supreme Court, Mr. Justice Brown held that if a steamer had run at high speed an hour before, and was running dead slow at the time when she first heard the whistle of the approaching steamer, fault could not be imputed to her for her previous speed. In the Lepanto, 21 Fed. 651, 659, Judge Addison Brown held that, where a whistle is distant, and no danger can be incurred by delay, immediate stopping is not necessary; that it is always safe to stop and reverse; and, if a steamer does not stop and reverse when it is shown by events that collision might have been avoided, she must establish clear justification for her course. New York and Liverpool, etc., Co. v. Rumball, 21 How. 372, 384, 16 L. Ed. 144; The Khedive, etc., 5 App. Cas. 876, 890, 908.

It cannot be said that the Morse was at fault because if she had stopped, or had reduced her speed at Mark Island, she would not have reached the point where the two steamers intersected. In The Umbria, 166 U. S. 404, 422, 17 Sup. Ct. 610, 41 L. Ed. 1053, Mr. Justice Brown points out the fallacy of this argument, and shows it is equally true that if a vessel had been going at greater speed she would have passed the point of intersection. Clearly, this test cannot be applied on the question of speed. The propriety of seamanship cannot be judged by the chance that two vessels may or may not reach a point of intersection at the same time, but rather by the question whether their speed can be stopped before they arrive at the point where their courses intersect. In the case before me, I have found that the Morse was not only stopped before arrival at the point of intersection, but that she was actually going astern.

[4] An important question is raised in reference to the duty of the Morse on her arrival at the entrance of the Thoroughfare at Mark Island. She there heard the whistle of the Pemaquid. Her officers decided that the whistle showed the approaching steamer to be in the Thoroughfare, about at a point not far distant to the westward of Stonington, and, on this supposition, they assumed that they had time to reach Field Ledge Buoy before the Pemaquid could arrive there. It is evident that at this point the Morse was in the position of a "steam vessel hearing, apparently forward of her beam, the fog signal of a vessel." The contention of the libelant is that the whistle of the vessel, apparently forward of her beam, was the whistle of a vessel the position of which was then and there "ascertained" by those on board the Morse, and that therefore the steamer was justified in proceeding, as she did, to Field Ledge Buoy. Article 16 is predicated upon a condition of fog, upon a condition in which it is impossible to see at any considerable distance. The rule cannot mean, then, that it is necessary for those upon a steamer to see an approaching steamer in order to "ascertain" her position. Such ascertainment must be by other means than by sight. When the whistle of the Pemaquid was first heard, the officers of the Morse recognized the whistle, and judged that it was approximately one and one-half or two miles distant, in Deer Island Thoroughfare, and "this side" of Stonington. The proofs show that the officers of the Morse were correct in their conclusion as to the Pemaquid's location. In fixing that location, they appear to have been governed by their familiarity with the locality, their knowledge of the approaching steamer, of her landing places, and habits of navigation. Some of the witnesses have assumed that, within the meaning of the rule, the bringing of an approaching vessel in sight is necessary to "ascertaining" her position. I cannot think so. Under all the circumstances shown by the proofs, and under a fair interpretation of the rule, I think it must be held that those in charge of the Morse had "ascertained" the position of the Pemaquid. Before proceeding upon their course, they estimated her situation with sufficient accuracy to conform their own navigation to it. They knew, too, that she was required to come down on the side of the channel opposite to that which the Morse was using; and they had a right to assume that she would do this. What, then, was the duty of the Morse? She had 60 or 70 passengers aboard. She was in an open seaway, near Mark Island, in a thick fog. The island could not be seen at a distance of more than three or four hundred feet; the steamer had nothing by which to fix her own location, or from which to take her departure, except Mark Island. To remain there and await the Pemaquid might mean "immediate danger" of losing her reckoning and getting upon the ledges; her officers considered it was the part of prudence to proceed to Field Ledge Buoy. I think they ought not to be held at fault for this decision.

As bearing on the duty of the Morse when she arrived at Mark Island, the learned proctors for the claimant bring to my attention the case of the Selja Lie v. San Francisco & Portland Steamship Co., 243 U. S. 291, 298, 37 Sup. Ct. 270, 61 L. Ed. 726. The collision between the steamers Selja and Beaver occurred on the high seas near Point

Reyes, on the California Coast, a few miles off the entrance to San Francisco Harbor. The facts in that case, as found by the court, were substantially these: At 3 o'clock the Selja was proceeding at half speed of six knots; at 3:05 this was reduced to three knots; at 3:10 she stopped her engines; at 3:14 she was still making headway; at 3:15 she executed full speed astern; the collision occurred at 3:16. Holding that the duty to stop her engines was imperative when she heard the signal from the other steamer forward of her beam, considering the well-known difficulty exactly to ascertain the position, course, and distance of a vessel in a fog, speaking for the court, Mr. Justice Clarke says:

"It is of no avail for this master to say that at the instant of the accident he thinks the momentum of his ship had been overcome, and that she was commencing to move backward in response to the 'full speed astern' order, which had been given during the instant that had elapsed between the appearance of the Beaver through the fog and the coming of the ships together, for the evil had been done and the collision rendered inevitable."

In the case of the Selja the vessels were in the open sea; there were no such circumstances and conditions as those which were presented to the master of the steamer Morse, in maintaining his speed from Mark Island to Field Ledge Buoy. The master of the Selja was mistaken as to the course and distance of the oncoming vessel; in the open sea he had few reliable data from which to fix her location. On the other hand, the master of the Morse had an intimate and daily knowledge of the locality; he knew the landing places which the Pemaquid would make; he decided correctly as to the position and distance of the Pemaquid from the moment when he first heard her whistle. In the case of the Selja, it was not until her master heard the whistle of the Beaver three times that he recognized it as the whistle of the approaching steamer, and that he began to take definite observation of it. But the officers of the Morse were expecting the Pemaquid; they recognized the whistle as her whistle, and at once made their navigation conform to their ascertainment of her location. They estimated correctly in deciding that they could reach a place of safety for the Morse, and could give the Pemaquid an opportunity to pass safely if she were prudently navigated. They could not have reached such a conclusion in the open sea in a fog, but they could readily reach it in Deer Island Thoroughfare. It is important to note in this connection, that the error of the Pemaquid when she left Allen's Bar did not arise from her improper ascertainment of the Morse's position, but from her own navigation, after she had located the Morse.

I think the case of the Selja is not in point, and cannot influence the determination of this case.

Among other charges of fault, it is alleged that the Morse changed her course in such a way that she blocked the channel; and it is in evidence that the local inspectors found that, at the time of the collision, the Morse was backing partly across the channel and across the course of the other steamer. I can find no testimony, now before the court, which warrants such a conclusion.

The other charges of fault made by the Pemaquid against the Morse are not sustained by the proofs.

The court finds that the Morse was not at fault, and that the Pemaquid was solely at fault, for the collision. A decree may be presented accordingly. The libelant recovers costs.

Fritz H. Jordan, Esq., is appointed assessor. Upon the coming in of his report, the court will pass upon such further questions as may arise.