## THE ANSALDO SAVOIA.

## THE RIPOGENUS.

(District Court, E. D. Virginia. December 9, 1921.)

1. **Collision** ⟨⟩82(2)—**Vessel holding speed in fog held at fault for collision with vessel signaling.**

   Master's failure to stop engines during heavy fog on hearing fog signals *held* to render vessel at fault for collision with vessel signaling.

2. **Collision** ⟨⟩84—**Vessel giving signal indicating stop, but continuing, held to have burden of proving fault did not cause collision.**

   Sounding signal in fog indicating that vessel had stopped, when still making considerable headway, in violation of International Rules, art. 15 (Comp. St. § 7853), *held* to render the vessel at fault, in absence of a showing that such fault could not have been one of the collision causes; the vessel having the burden of showing, not merely that such fault might not have been one of the collision causes, but that it could not have been.

3. **Collision** ⟨⟩85—**Evidence held to show operation of vessel at immoderate speed in fog.**

   In libel for damages sustained in collision in fog, evidence *held* to show operation of vessel at an immoderate rate of speed, in violation of International Rules, art. 16 (Comp. St. § 7854).

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Collision ⊚⇒82(2)—Vessel which failed to stop on hearing fog signals of other vessel held at fault.**

In libel for damages sustained in collision in fog, vessel which failed to stop in dense fog, when fog signals of other vessel were heard, or should have been heard, in view of frequency with which such signals were sounded, *held* at fault for collision, though other vessel gave signal indicating that it had stopped, where there were no visible objects nor well-defined paths by which the one vessel might conclusively find the location or direction of the other.

In Admiralty. Libel by one Revello, master of the steamship Ansaldo Savoia, against the steamship Ripogenus, with cross-bill by the master of the steamship Ripogenus against the steamship Ansaldo Savoia. Decree finding both vessels at fault.

Hughes, Little & Seawell and Henry H. Little, all of Norfolk, Va., for the Savoia.

Hughes, Vandeventer & Eggleston and Braden Vandeventer, all of Norfolk, Va., and Blodgett, Jones, Burnham & Bingham and E. E. Blodgett, all of Boston, Mass., for the Ripogenus.

GRONER, District Judge. Cross-libels were filed by the respective vessels, each claiming fault against the other causing the collision.

The Savoia, a steel vessel of 5,228 gross tons, light, was on a voyage from Genoa to Galveston, via Hampton Roads. The Ripogenus, a wooden steamer, 2,278 gross tons, was on a voyage from Norfolk to Searsport, Me., with a cargo of 2,513 tons of coal. The vessels collided in a dense fog in the immediate neighborhood of No. 2 Buoy, located about 4½ to 5 miles nearly due east from Cape Henry Light. The moment of impact is stated by the crew of the Ripogenus to have been 8:40 a. m.; by the crew of the Savoia, 8:45 a. m.

The Ripogenus left Hampton Roads shortly before midnight, April 7th, but encountering a thick fog, anchored a short distance inside the Capes. The fog having lifted somewhat, she got under way about 6:45 o'clock the next morning, and proceeded under slow speed—about four knots an hour—passing Cape Henry at 8:02 a. m., steering east by south, three-quarters south, for No. 2 Buoy. The captain of the Ripogenus, who was then on duty in the pilot house, with a quartermaster at the wheel, a lookoutsman and boatswain on the forecastle head, and the mate on the bridge, first heard the signals of an approaching vessel two points on his starboard bow about 8:30 a. m. The other vessel then appeared to him to be from a mile to a mile and a half away. He continued to hear the fog whistle of the approaching vessel about every two minutes until 8:36, when he stopped his engines, and at 8:37, while the vessel was still under way, blew two long blasts of his whistle. At 8:38 he reversed his engines and gave two more long blasts of his whistle. At 8:39, or 8:39½, he saw the approaching vessel come out of the fog, heading right on him, about two lengths away, and within a few seconds thereafter the collision occurred; the bow of the Ripogenus striking the port side of the Savoia and damaging both vessels.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The Savoia had been running at slow speed in the thick fog since 2 o'clock of the night before the collision. At about 7 a. m. of the day of the collision she got her position from Cape Henry and Hog Island stations, and at 7:50 she made 2 CB Buoy, located nearly due east from Virginia Beach and distant southeastwardly about 5½ miles from No. 2 Buoy, and thence steered a course which would have brought her a little to the southward and eastward of the last-mentioned buoy. The captain of the Savoia testifies that the fog was dense (thicker than he had ever seen it before in the United States) and that he sounded his fog whistles at regular intervals as he approached this buoy; that between 8:40 and 8:45 he heard two long whistles forward, on his port side, and that he ported his helm and answered by one whistle; that a moment or two later he heard two more whistles and ported more, and answered again with one whistle; and that almost immediately thereafter he saw the approaching steamer coming out of the fog, less than a ship's length away, and moving, as he estimated, at half speed. On cross-examination the master of the Savoia fixes the time of the collision at 8:45, and places the speed of his ship between the two buoys at anywhere from 3½ to 4½ miles; and he indicates the point of collision, on the chart, as south and a little east of Buoy No. 2, and about one mile away. The evidence for the Savoia shows that, in addition to the master, there were on the bridge four other officers, with a man at the wheel and a lookout on the forecastle.

The negligence charged against the Ripogenus is: (a) That she violated article 16 of the International Rules (Comp. St. § 7854) in running at an immoderate speed in the fog; and (b) that she violated article 15 of the International Rules (section 7853), in that, while still having way upon her, she sounded two prolonged blasts of her whistle, indicating that she had stopped, when in fact she had not. The negligence charged against the Savoia is: (a) The violation, likewise, of article 16 in running at an immoderate rate of speed in a fog; (b) in failing to stop her engines and navigate with caution when she first heard the fog signal of the Ripogenus forward of her beam; and (c) in not sooner hearing the fog signals of the Ripogenus.

[1] Admittedly, the master of the Ripogenus heard the fog signals of the Savoia as early as 8:30, or at least 10 minutes before the vessels collided. He answered the signals by repeated blasts of his whistle, but did not stop his engines until 6 minutes later, when it was apparent to him that the proximity and course of the approaching vessel was such as to render it dangerous to continue to run even at slow speed. At 8:36 he stopped his engines, and at 8:37 he blew a signal indicating to the other vessel that he was stopped and had no way on, when the fact is that, even with his engines stopped, his ship was making around three or four miles an hour. It is true that a minute later he reversed his engines, and I think it is equally true that at the moment of the impact the Ripogenus was practically stationary; but, even if this be conceded, it cannot be fairly insisted that her disregard of the rules in the respects mentioned did not materially contribute to the collision.

It is not enough to say that there was no reason for stopping when the fog whistle of the approaching vessel was first heard, because she then appeared to be a mile or a mile and a half away. There was no certainty of her position or distance, and experience has shown that nothing is more difficult than to determine either, in weather conditions such as existed on the morning of the collision. Due regard for the rule imposed upon her master the duty to stop her engines when the first fog whistle was heard. If she had done so, and the collision had occurred nevertheless, she would have been without fault. As it is, her disregard of the rule put her in a position directly in the path of the approaching vessel, and it is not possible now to say that her fault might not have been, or probably was not, one of the causes leading to the collision.

[2] What is said above in criticism of the failure of the master of the Ripogenus to stop his engines at 8:30 applies to his misleading signal at 8:37. It is true that at the time of this signal his engines had been stopped a full minute; but it is equally true, according to his own admission, that he was still making considerable headway. The signal, however well intended, was misleading. What effect it had upon the collision is difficult to determine, but in any aspect of the matter it casts upon the offending vessel the burden of showing, not merely that such fault might not have been one of the collision causes, but that it could not have been, and this burden is not met by any evidence offered on her behalf, from which it follows that the Ripogenus must be held at fault.

[3] Was she, however, solely to blame? The Savoia, as has already been shown, was headed on a northwest course from Buoy 2 CB to a point which would have put her in the ship channel at the entrance to Cape Henry. She had recently been in dry dock, her bottom was clean, the tide was favorable, and her engines were making, according to her crew, 20 revolutions, which the captain estimates produced a speed of from 3½ to 4½ miles an hour. He had out no log line, and his estimate of the rate of speed was necessarily wholly conjectural. He made Buoy 2 CB, at 7:50 and, according to his own statement, had reached a point within a mile of Buoy No. 2 when the collision occurred at 8:45. This distance is approximately 4½ miles, and if the point of collision as given by the master and crew of the Ripogenus is correct the distance was at least 5½ miles. Striking an average, which is, perhaps, as nearly correct as is possible under the circumstances, the distance between the two points would be approximately 5 miles, and the running time approximately 55 minutes, which would make the speed of the vessel between 5 and 5½ miles an hour.

I think it is perfectly fair to conclude that this is reasonably correct. For the first 3 or 4 miles the evidence is that no fog whistles of other vessels were heard. If this be true, it cannot be said that the speed of 5 miles an hour was excessive; but the Savoia was approaching a frequented path of commerce. Buoy 2, off Cape Henry, is in the track of vessels incoming and outgoing, coastwise and foreign, and around the date of this collision there was scarcely an hour of the day when at least two or three vessels bound in or out of Norfolk,

Baltimore, or Newport News were not in sight. As she approached this danger zone, in a fog so dense that a vessel could not have been seen a ship's length away, common prudence demanded diminished speed. The lowest speed, consistent with steerageway, would have been suggested by good seamanship, and probably was required under the exact terms of the rules, for it has been so frequently held as not to require citation that only such speed is allowable in a fog as will enable the vessel to be stopped in time to avoid a collision after the approaching vessel comes in sight, provided such approaching vessel is herself going at moderate speed. In the dense fog prevailing on the morning of this collision a literal compliance with this rule would have been, perhaps, impossible, for in the density of the fog objects were only visible a few hundred feet away, and the slightest movement forward of the ship would have carried her this distance before she could be stopped. Hence the safer course would have been to anchor and lie to until the fog had lifted. If this had been done, it is obvious the collision would not have occurred.

[4] But there remains yet another fault to be considered. The evidence on behalf of the Ripogenus is that her fog whistle was sounded every 40 seconds for an hour before the collision. I am satisfied that this is true, and in the weather conditions then prevailing it is inexplicable to me that those on board the Savoia should not have heard it sooner than they admit they did; and I am convinced that either they did hear it, at least a mile and a half away, or that their failure to hear it was inexcusable neglect. If they did hear it, applying the concluding paragraph of article 16, the positive duty was imposed on her master of stopping the engines of his vessel and navigating with caution until the danger of collision was over. This he did not do, but justifies his neglect of the rule upon the theory that, relying upon the two-blast whistle of the Ripogenus, he had a right to guess her position, and, having determined that to his satisfaction, to continue his course and speed, and in support of this position counsel relies upon the opinion of Judge Hale in The Pemaquid (D. C.) 255 Fed. 709–717, in which it is said:

"The rule cannot mean, then, that it is necessary for those upon a steamer to see an approaching steamer in order to 'ascertain' her position. Such ascertainment must be by other means than by sight."

It is unnecessary, in my view of the essentially different conditions in this case and that from which the quotation is taken, to determine whether the quoted paragraph correctly states the law or not. Doubtless, circumstances may exist in which the exact position of an approaching vessel may be ascertained by other means than sight, and if the "ascertainment," however made, be positive and certain, the rule will have been complied with, and the vessel may thereafter continue, without fault, on her course. But that this is not the case here must be admitted.

The vessels here were in the open sea; there were no physical objects nor well-defined paths by which the one might conclusively define the location or direction of the other. In the nature of things, the navigator of the Savoia did not, and could not, know whether the

vessel, whose whistle he had twice heard according to his own admission, and which, in my view of the case, he should have many times heard, was approaching any given point, or had reached and was stationary at any given point. He could not know whether she was headed north or headed south. He could not even be certain whether she was headed in or out of the Capes. Such conclusions as were possible were at best only guesswork, which could only be confirmed by careful and prudent navigation until all danger was passed. He should immediately have stopped his engines, and thereafter so controlled his own vessel that her speed, when the other vessel came in sight, could have been checked and the collision prevented.

Instead of this he continued, at a dangerous speed, porting his helm from time to time, showing thereby his uncertainty as to the location of the vessel ahead of him, until a collision was inevitable, and in this respect he was to blame, and a decree finding both vessels at fault will be entered.