242 F.2d 368
 CITIES SERVICE OIL COMPANY, as chartered owner and owner pro
hac vice of THE S.S. WINTER HILL, Libellant-Appellant,
v.
THE S.S. SEA WIND, her engines, boilers, etc., Respondent-Appellee.
SEATRADERS, Inc., as owner of The S.S. Sea Wind,
Cross-Libellant-Appellee,
v.
CITIES SERVICE OIL COMPANY, as chartered owner and owner pro
hac of The S.S. Winter Hill, Cross-Respondent-Appellant.
 Nos. 191, 192, Dockets 24062, 24063.
 United States Court of Appeals Second Circuit.
 Argued Feb. 7, 1957.
Decided March 19, 1957.
 
 Hill, Betts & Nash, New York City (Eli Ellis, New York City, of counsel), for libellant-appellant and cross-respondent-appellant.
 Dow & Stonebridge, New York City (William A. Wilson, New York City, of counsel), for respondent-appellee.
 Before CLARK, Chief Judge, MEDINA, Circuit Judge, and SMITH, District judge.
 MEDINA, Circuit Judge.
 
 
 1
 As darkness closed in at 6:52 P.M. on February 4, 1952, two vessels scraped past one another in a collision a few hundred yards north of the intersection of the Bellevue Range and the Marcus Hook Range, in the narrow channel approach to Wilmington, Delaware. The Winter Hill was held solely to blame and we agree.
 
 
 2
 The Sea Wind, a Liberty ship 'fully laden with a cargo of iron ore,' with a deep draft close to 28 feet, inbound from sea, was proceeding north, with a favoring one-knot current, to Marcus Hook anchorage for quarantine clearance before approaching the Port of Philadelphia. She was making about four knots through the water, sounding for signals at regular intervals, as there was a vaporish, low-lying fog, which tended to obscure the flashing channel buoys but left all clear overhead. As the Sea Wind swung into Bellevue Range, the range lights were clearly visible, as the fog, as found by the trial judge, was only 'hull high, perhaps three or four feet above the deck.' She had no radar. A short distrance ahead of the Sea Wind, making about two knots, was the tug Sonittep #2 with the barge Winifred Sheridan in two, lashed to starboard. Both the tug and the Sea Wind had been for some time sounding fog signals; and, as the Sea Wind closed in, the Sonittep #2 moved over to port to let her pass and then swung back to starboard, following close behind the Sea Wind up Bellevue Range. The place of passing is fixed as flashing buoy 6B on the east side of the channel, to starboard of the Sea Wind and the tug and tow.
 
 
 3
 Because of the fog it was the intention of the tug to turn at the flashing bell buoy 2M and anchor out of the channel; and she followed the wake of the Sea Wind, guided by the ship's lights which were visible to the tug personnel, in order to be guided up the channel to the anchorage. As they rounded the turn from Bellevue Range to Marcus Hook Range, the tug and tow were about 700 feet astern of the Sea Wind, at least within sight of her, according to Ellis E. Jones, mate of the tug, who was in the stem of the barge as a lookout. Jones testified that the Sea Wind was visible to him right up to the moment of the collision, which occurred as the tug and tow rounded buoy 2M and 'headed for the woods.'
 
 
 4
 We shall pause to follow the Winter Hill as she came south, before we describe the critical developments vis-a-vis the two vessels immediately prior to the collision. The Winter Hill was a tanker 504 feet in length, with a beam of 68. She had left the Port of Philadelphia, where she discharged her cargo, and was proceeding to Lake Charles, Louisiana, to load new cargo. She was equipped with radar, which seems, as so often is the case, see Polarus Steamship Co. v. The T/S Sandefjord, 2 Cir., 236 F.2d 270, to have been of little avail, despite the fact that the Sea Wind was observed when she was some seven miles away.
 
 
 5
 We must dismiss the Winter Hill's rather improbable version of what took place as it was discredited and 'disregarded' by the trial judge, who 'was very favorably impressed by the captain of the Sea Wind for his concise and prompt and generally intelligent testimony, and also by the master and mate of the tug.'
 
 
 6
 Accordingly, it is established as a matter of fact that, in disregard of the fog and the 'limited visibility,' the Winter Hill came plowing down the channel at the obviously excessive speed of between 7 and 9 knots, without sounding any fog signals whatever. She evidently lost track of the fact that the Sea Wind had been sighted in the radar when far in the distance.
 
 
 7
 The first notice the Sea Wind had of the presence of the Winter Hill was when she saw her white light. A single blast from the Sea Wind brought a similar response from the Winter Hill; but the port-to-port passage was not possible. The trial judge concluded that at the time the light became visible to those aboard the Sea Wind she was already in extremis and the sounding of the single blast could not be taken as a fault in such an emergency. Besides, he very properly held that the sounding of that signal 'did not in any way cause the accident.' We may remark parenthetically that it seems to us not unlikely that what occurred was that one of the Sea Wind's fog signals was mistaken for an invitation to a port-to-port passage, but there is no doubt of the single blast from the Winter Hill; and we are content to take the finding as made, which is in accordance with the testimony of the pilot of the Sea Wind.
 
 
 8
 In any event, the Sea Wind did not stop her engines, and the trial judge found in substance that this again was a matter of judgment and he said that his own 'predisposition' was that 'she should keep her way, which was not very great, to avoid the set of the wind and tide.'We cannot say that these findings are clearly erroneous. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746. The fault of the Winter Hill is all but formally conceded. The visibility was in the neighborhood of two ship's lengths or slightly more than the distance which separated the Sea Wind and the tug and tow behind her. Of course the distance cannot be accurately admeasured; even the witnesses aboard the Sea Wind did not agree on this point. But sufficient appears to make the rule of The Sylvan Arrow, 2 Cir., 104 F.2d 102, certiorari denied sub nom. Luckenbach S.S. Co. v. The Sylvan Arrow, 308 U.S. 603, 60 S.Ct. 140, 84 L.Ed. 504, inapplicable, as we cannot say that the failure of the Sea Wind to stop or reverse her engines was a factor in causing the collision. Accordingly, The Fountain City, 6 Cir., 62 F. 87, The Ansaldo Savoia, D.C., 276 F. 719, and The El Monte, D.C., 114 F. 796, cited by appellant, have no application here, even if it be assumed arguendo that the Sea Wind was not sufficiently apprised of the precise location of the Winter Hill when she hove in sight.
 
 
 9
 Appellant makes much of certain 'ifs' and certain subjunctives used by the trial judge in rendering his oral opinion at the close of the case, and we are particularly urged to reverse because the trial judge commented with reference to the Sea Wind, 'I don't know where she was, whether she was on the right side or the wrong side' of the channel. These criticisms are mere pinpricks; they touch the surface only. The trial judge unequivocally adopted the Sea Wind's version, because he believed the testimony of her master and 'because it is supported by the only independent witnesses we have,' namely the master and mate of the tug. As above indicated, all these witnesses placed the Sea Wind on the extreme edge of the channel to her starboard, which is precisely where she should have been. Under these circumstances it is idle to speculate on the possibility that the set of the wind, the force of which the Winter Hill exaggerated, and the current carried the Sea Wind out of position as she made the rather easy turn into the Marcus Hook Channel. We must not forget that the tug and tow followed close astern of the Sea Wind, they were in the very act of rounding buoy 2M, which was on the edge of the channel to starboard, and as the Winter Hill swept by, according to the lookout on the barge, 'she almost didn't get by,' and her bow wash flooded the stern deck of the tug and wet the cook up to his waist.
 
 
 10
 Under these circumstances we find no occasion to apply the Major and Minor Rule or the doctrine of The San Simeon, 2 Cir., 63 F.2d 798, relied upon by appellant. See also The Victory, 168 U.S. 410, 423-424, 18 S.Ct. 149, 42 L.Ed. 519.
 
 
 11
 Affirmed.
 
 
 12
 CLARK, Chief Judge (concurring).
 
 
 13
 I concur in the result, but would reach it by a different route. I agree with the trial judge that Article 16 of the Inland Rules, 33 U.S.C. 192,[1] did not require the Sea Wind to stop her engines, since she had ascertained the position, if not the course, of the approaching vessel, and that in any event the facts are appropriate for applying the Major and Minor Fault Rule. The Victory, 168 U.S. 410, 423-424, 18 S.Ct. 149, 42 L.Ed. 519; The San Simeon, 2 Cir., 63 F.2d 798, certiorari denied Pacific Atlantic S.S. Co. v. Mooremack Gulf Lines, 290 U.S. 643, 54 S.Ct. 61, 78 L.Ed. 558.
 
 
 
 [1]
 ' § 192. Speed in fog, etc. Art. 16. Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions
 'A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over.'