## THE OLD COLONY.

### INGRAHAM v. J. S. PACKARD DREDGING CO.

No. 1143.

District Court, D. Maine, S. D.
July 18, 1931.

Supplemental Memorandum July 31, 1931.

Burnham, Bingham, Gould & Murphy, of Boston, Mass. (Foye M. Murphy, of Boston, Mass.), for libelant.

Nathan W. Thompson, of Portland, Me., for claimant.

HALE, District Judge.

The fishing schooner Shirley M. Clattenburg came in collision with the steam tug Old Colony a short distance north of the

eastern entrance of the Cape Cod Canal on April 7, 1928, at about 9 o'clock in the morning.

The schooner was about three years old, of forty-seven gross, and twenty-two net, tonnage; 68.2 feet in length; 17.1 feet beam. She was equipped with a 60 horsepower Fairbanks-Morse crude oil engine which gave her a full speed estimated to have been about 6½ knots, and she was proceeding under power. She had left the port of Gloucester early that morning for the fishing grounds off the Virginia Capes. Off Minot's Light she ran into a thick fog. Her captain testifies that her engine was reduced to a little less than half speed, giving her a speed through the water of about 3 knots. She passed Mary Ann gas buoy, with Manomet Light close by on the starboard side, and steered for the eastern entrance of Cape Cod Canal. The wind was southwest, light; there was very little sea, but the fog had come in thick, with visibility about half the length of the schooner.

About 9 o'clock in the morning four men on deck testify that they heard on the starboard bow the rush of water of an approaching vessel, and heard no fog whistle. The schooner's helm was immediately starboarded, and the schooner turned her bow to port. Immediately there broke out of the fog, less than the length of the schooner away, as the crew of the schooner testify, first a bow wave, and then the bow with a rope bumper on top, followed by the pilot house of the steam tug Old Colony. The stem of the tug struck the schooner's starboard side about 15 feet from her stern, drove athwartships the timbers of the schooner, and caused her to leak. The tug came alongside to beach the schooner, but, as she surged against the schooner's port side, she drove the athwartships timbers back, thereby diminishing the leak. The tug then towed the schooner into the port of Gloucester. Both vessels were injured. William Ingraham, master and part owner of the schooner, seeks by this suit in rem to recover damages occasioned by the collision.

The tug Old Colony is a steam tug, burden of 741 tons, 184.2 feet long, 32.5 feet beam, and 11.3 feet deep. At the time of the collision she was owned by the Packard Dredging Company, of Providence, R. I. She was bound from her home port, Providence, through the Cape Cod Canal, to Portland, Me., where her owners were carrying on dredging operations. As she came through the canal, the weather was clear, and she was proceeding, according to her testimony, at various speeds, in accordance with the practice when going through the canal. After she left the eastern entrance of the canal, the weather was clear and remained so for some time. When it shut in thick, the testimony on her part is that she reduced to slow speed of about 3 to 3½ miles an hour, and started sounding her fog whistle. She was in charge of her spare master, Anthony Bona. Her regular master had gone below, shortly before the collision, and was lying in his bunk awake. Witnesses on her part show that after the fog shut in she proceeded, sounding the regular fog signals, until suddenly the captain in the pilot house and the lookout on deck heard two short blasts of a fog horn just off the port bow, and at practically the same time the schooner Clattenburg broke out of the fog, under power with no sails set, going at a speed which the tug estimates at about 8 miles an hour, swinging sharply to port across the course of the Old Colony. The tug's testimony is that on hearing the fog horn of the schooner the tug engines were stopped, and backed immediately, on seeing the schooner, but too late to avoid the collision; the tug claiming that the schooner swung her starboard quarter right into the stem of the tug.

Each vessel alleges that the other was proceeding at immoderate speed in the fog. No question is raised as to what constitutes moderate speed.

In The Pemaquid, 255 F. 709, 712, this court applied the test of the courts:

"That moderate speed implies the ability of a vessel to stop her headway in the presence of danger; that vessels in a fog are bound to reduce their speed to such a rate as will enable them to stop in time to avoid a collision after the approaching vessel comes in sight, providing such approaching vessel is herself going at the moderate speed required by law. The Chattahoochee, 173 U. S. 540, 548, 19 S. Ct. 491, 43 L. Ed. 801; The Umbria, 166 U. S. 404, 17 S. Ct. 610, 41 L. Ed. 1053; The Sagamore, 247 F. 743, 746, 750, 159 C. C. A. 601; The Lepanto [D. C.] 21 F. 651, 659; The Michigan [D. C.] 63 F. 295."

In The Chattahoochee, above cited, Mr. Justice Brown, speaking for the Supreme Court, said:

"It has been said by this court, in respect to steamers, that they are bound to reduce their speed to such a rate as will enable them to stop in time to avoid a collision after an approaching vessel comes in sight, pro-

vided such approaching vessel is herself going at the moderate speed required by law."

Mr. Justice Brown clearly referred to the language of the court in The Umbria, supra, 166 U. S. 404, 421, 17 S. Ct. 610, 617, 41 L. Ed. 1053:

"If two steamers are approaching each other in a fog, manifestly their maneuvers must be determined, not by the chance of their meeting at a point where their courses intersect, but upon the theory that their courses shall not actually intersect; in other words, that both shall stop before the point of intersection is reached. And if one of them is running at such a speed that no maneuver on the part of the other can prevent that one from passing the point of intersection, the latter only is responsible."

In the Michigan, supra, the court applied this rule that moderate speed in a fog is that rate which will permit a steamer to stop, after hearing a fog signal, in time to avoid the vessel which has complied with the law in giving it.

In, The Sagamore, supra, in this circuit, speaking for the court, Judge Brown said:

" 'The navigator is entitled to proceed in expectation of compliance on the part of others with the law in respect to fog signals as recognized in the second provision of the above-quoted rule,'—i. e., rule 15, Act Feb. 8, 1895, 28 Stat. 648 (Comp. St. 1916, § 7925 [33 USCA § 272]); Erie & Western T. Co. v. City of Chicago, 178 F. 42, 49, 101 C. C. A. 170 (C. C. A. 7th Cir.), citing Casement v. Brown, 148 U. S. 615, 13 S. Ct. 672, 37 L. Ed. 582, and The Victory v. The Plymothian, 168 U. S. 410, 426, 18 S. Ct. 149, 42 L. Ed. 519, cases which seem to support the general proposition that a vessel is entitled to presume that another vessel will act lawfully, though these are not fog cases."

On the morning in question the fog was thick; as is shown by the testimony on both sides. One witness says it was one of those "thick, heavy mulls," and that "you could see less than half the length of the schooner," which was 68 feet long. One of the witnesses on the tug Old Colony says "I could see about 100 feet"; another says he could see about 50 feet; another about 20 feet. It is clear that at the time of the collision the range of visibility was somewhere from 20 to 100 feet.

As to the speed of the tug, the evidence is contradictory. One of her seamen says that at the time of the collision the tug was going about a mile an hour. Capt. Bona testifies that she was going less than half-speed, probably 3 to 3½ miles an hour. The engineer of the tug did not testify. On the morning of the collision the steam tug Relief was on its way to help the Eastern Steamship Line steamer Robert E. Lee, then aground on Mary Ann Rocks between Plymouth and the canal. By a stipulation in the case it appears that the Relief came out of the canal at 8:20 in the morning. Shortly after passing No. 1 bellbuoy off the eastern entrance to the canal she overhauled and passed the tug Old Colony between Lookout Point and Center Hill, at which time it was estimated by those of the Relief that the speed of the Old Colony was about 8 miles an hour; and that when abreast of the tug they ran into a fog bank, and both boats began to blow steam whistles at frequent intervals. It appears by the testimony of Capt. Bona that the Relief passed the tug about five minutes after the fog shut in.

On the part of the schooner, the engineer, Patterson, testified that he had a talk with Hemmalin, the captain of the tug, four or five minutes after the collision, while Hemmalin was leaning outside of his pilothouse window. That he asked Hemmalin, "How many knots was you making, Captain, coming through there?" To which Hemmalin replied, "Seven and a half." "I said to him, 'Weren't you going at pretty fast speed in a thick fog, with a lot of boats down there?' He didn't say any more. He said he was turned in." This appears to have been not far from the speed which the master of the tug Relief estimated as the speed of the Old Colony, when he passed her just after the fog set in. In his deposition Hemmalin said that the tug "was not making much over five, if she was making that."

Johannson, a seaman above deck on the tug, was asked, "What was the speed of your tug at the time of the collision?" He replied: "Well, I couldn't tell. It was too quick. I couldn't tell." Ingraham, the captain and half owner of the schooner, testifies that he saw the tug when she broke through the fog; that he "saw nothing but the white foam from the bow. * * * She never slackened up no speed nor altered no course." And he says that she maintained the bow wave "until she went into us," and that he saw nothing but the foam when she broke through the fog. He further said, "When I heard the rush of water I knew it wasn't the buoy; I thought it might be the breakers, the surf on the beach; the sound would be the same." Wilson, the lookout on the

schooner, testified that five or seven minutes after the Relief had passed the schooner he heard a rush of water from the bow of the tug, and that was the first sound he heard; and the rush of water was the first thing he knew of the presence of the tug.

Parks, who was at the starboard fore rigging of the schooner, blowing a horn, testified: "I heard nothing until I heard the rush of the water from the bow." He also testified that he heard no fog whistle, and that the rush of water was from the wave at the towboat's bow. The next thing he saw was the pilothouse. McKinnon, the man at the wheel, testified that the first he knew was a rush of a boat going through the water off to starboard, two or three points off the starboard bow; that he could see nothing, but could only just hear it. He was asked when he first saw anything with reference to the tug, and answered; "I could hear this rush of water, and of course I was watching for the rush, and the first thing I saw was this big white wake of water; and then suddenly, a second or so right after that, her bow loomed up and the big bumper that they have on their bow —this big, heavy bumper; and the next thing she crashed into us and I saw the big pilot house; a reddish pilothouse."

Capt. Bona was asked on cross-examination: "In spite of reversing your engine, which would throw your bow to starboard and your stern to port, you nevertheless were going ahead in the water so fast that under your starboard helm you swung four points to port before the collision; against your reversing engine?" The answer was, "Yes." It seems, then, that the tug must have been proceeding under some speed, in order to have answered her rudder so quickly in so short a distance. The tug was entitled to proceed in anticipation that the schooner would comply with the law in reference to speed. It appears from the testimony of the captain and the engineer that, when the fog came in, her engine was operated "three or four notches below half speed"; that the captain was sounding, in order to determine his location, and that each time as he threw the lead he rang a bell to the engineer, and the latter threw out the clutch of his engine which stopped the propeller; and that when the lead was hauled up the captain rang the bell again, the engine was put again into gear, and the vessel proceeded as before, at three or four notches less than half speed; that the captain sounded eight or ten times on the south course, "the last sounding being just a few seconds before the tug broke out of the fog."

It is urged on the part of the tug that the schooner answered her rudder at the time of the collision so quickly and in so short a distance as to indicate that she was proceeding at high speed, and that, when the captain of the schooner heard the Relief blow, instead of stopping, he swung his vessel away from the sound and continued at high speed; that the schooner was managed badly by an inexperienced fisherman, with so little knowledge that, when he heard the approach of the tug, he did not know whether his vessel was running ashore or was approaching a buoy; and that the schooner was operated without regard to the rules of navigation. There is force in all that is urged by the learned proctor for the tug upon this question; but from a preponderance of evidence I think the schooner appears not to have been proceeding at a rate greater than 2 or 3 knots an hour at the time of the collision.

Upon the whole testimony on this question of speed I am constrained to find that at the time of the collision the tug was proceeding at such speed that she could not stop in time to avoid the collision with the approaching schooner; the schooner at that time appearing to have been proceeding moderately in a fog. I find, therefore, that the tug was at fault for proceeding at immoderate speed in a fog in violation of the maritime rules.

Having found the tug at fault, it is not necessary to decide as to her other alleged faults.

Was the schooner also at fault?

Article 15 of the Rules of the Road requires that a vessel under power shall blow a whistle in a fog (U. S. Code, title 33, § 91 [33 USCA § 91]):

"A steam vessel shall be provided with an efficient whistle or siren, sounded by steam or by some substitute for steam, so placed that the sound may not be intercepted by any obstruction, and with an efficient fog horn, to be sounded by mechanical means, and also with an efficient bell."

It appears that the schooner was sounding a fog horn, and gave no other fog signal. The testimony on the part of the captain of the tug Relief is that, when about abreast of the tug Old Colony, both the Relief and the Old Colony ran into a dense fog bank, and both boats began to blow steam whistles at frequent intervals. The Relief continued on to the Robert E. Lee; and neither heard nor sighted any other vessel until the tug Old Colony was seen passing by, with the schoon-

er in tow. The Relief then heard no fog signal from the schooner, although she was running so close to the schooner that the swell she made caused the schooner to roll. It seems clear that, if the schooner had been sounding proper fog signals, those on the Relief would have heard them.

The schooner carried a fog horn; but she was not provided with an "efficient whistle or siren sounded by steam or by some substitute for steam, so placed that the sound may not be intercepted by any obstruction."

The schooner urges that the violation of this rule did not contribute to the collision; but it is a well-settled maritime rule that the burden rests upon the ship to show, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been a cause of the collision. The Pennsylvania, 19 Wall, 125, 136, 22 L. Ed. 148. In Belden v. Chase, 150 U. S. 674, 699, 14 S. Ct. 264, 272, 37 L. Ed. 1218, in speaking for the Supreme Court, Chief Justice Fuller said: "It is the settled rule in this court that, when a vessel has committed a positive breach of statute, she must show, not only that probably her fault did not contribute to the disaster, but that it could not have done so."

In the instant case the testimony falls far short of showing that the collision might not have been avoided if the schooner had complied with the rule with reference to fog signals. She was blowing a fog horn. Before the collision she blew one blast. It appears that, immediately after that, she blew another blast. I think it possible that the hearing of two blasts of a fog horn might have misled the tug. I think there is not sufficient testimony to show that the collision could not have been caused by the fault of the schooner in reference to fog signals.

I think the schooner was at fault in not complying with the rule in reference to sounding proper signals in a fog. Having found the schooner at fault, I do not think it necessary to pass upon other alleged faults.

Both vessels being at fault, damages must be divided. A decree may be presented accordingly. The libelant recovers costs. Albert B. Hall, Esq., is appointed assessor.

### Supplemental Memorandum.

In this case I divided the damages and awarded full costs to the libelant. In doing this I followed Pennsylvania R. Co. v. Golden (D. C.) 243 F. 256. In that case this court based its action on the Hercules (C. C.) 20

F. 205, in which case Judge John Lowell said: "I adhere to a remark which I made incidentally in The Mary Patten, 2 Low. 196, 199 [Fed. Cas. No. 9,223], that the general rule, so far as there can be one, should, in the absence of particular circumstances, give a libelant in a cause of collision his costs, though he recover but half his damages, where the loss is all on one side. Such has been the practice in the first and second circuits of late years."

The remark in The Mary Patten, to which Judge Lowell refers, was:

"If the loss is all suffered by one vessel, and her owner brings his libel, he will recover half his damages; and there is no reason why he should not, in general, recover his full costs. It is the ordinary case of a prevailing party recovering less than he asks for; and if there has been no tender or offer of amends, and no equity peculiar to the individual case, it is according to the sound and reasonable law of all courts that he should recover costs. * * * Returning to the case of injury on both sides, and of cross-libels to recover them, and no very substantial difference of fault or other equity, there appears to be authority for dividing the costs, and for refusing them to both parties."

In The Horace B. Parker, 76 F. 238, 22 C. C. A. 418, the District Court found the claimant's vessel solely in fault and decreed accordingly. Recoupment was pleaded, but no cross-libel was filed. On appeal, the Circuit Court of Appeals reversed the District Court, holding that both vessels were in fault, that the damages should be equally divided, and that the libelants were entitled to full costs in the appellate court, but that the costs in the District Court should be equally divided. In The Pemaquid, 295 F. 220, this court followed The Horace B. Parker, divided costs as well as damages, and held that in a collision case, where both vessels are at fault, and damages are divided, the costs in the District Court are also to be divided, unless circumstances are distinctly exceptional, even where large damage has been suffered by one vessel and very small damage by the other. This court referred also to the opinion of the District Court of Massachusetts in The Gladiator, 223 F. 381, 382: "Of course the District Court is not in any way controlled by its former decree, which was made on the theory that the tug alone was in fault. * * * The libelant's counsel contends that his client should be awarded the costs of the District Court. While this matter seems to me to be left to my discretion by the mandate, yet I

think that The Horace B. Parker, 76 F. 238, 22 C. C. A. 418, is intended to establish a general rule, binding in all cases where the damages are divided, unless the circumstances are distinctly exceptional. The costs of the District Court are therefore to be divided."

In the case at bar I think I did not sufficiently take into consideration the fact disclosed by the record that there was substantial damage to both vessels, and that, unless the circumstances are clearly exceptional, I should divide costs as well as damages.

 It is contended on the part of the libelant that there are exceptional circumstances which warrant this court in allowing the libelant full costs. The learned proctor for the libelant refers to correspondence tending to show that the litigation has proceeded at great expense to the libelant after he had offered to adjust the litigation by an interlocutory decree that both vessels were to blame; but the case shows "no tender or offer of amends" made of record; and the parties do not entirely agree as to the "exceptional circumstances." The testimony in the record reveals no such "exceptional circumstances."

On the whole, I think I am not justified in varying the rule of this circuit that in case of substantial injury to both vessels costs as well as damages should be divided.

I therefore change my opinion to that extent. The costs may be divided, as well as the damages.