### THE ERNEST H. MEYER.*
### THE EUREKA.

## BROUGHTON & WIGGINS NAV. CO. v. HAMMOND LUMBER CO.

No. 7590.

Circuit Court of Appeals, Ninth Circuit.
June 10, 1936.

*Rehearing denied Aug. 18, 1936.

GARRECHT, Circuit Judge, dissenting.

————◆————

Lillick, Olson, Levy & Geary and Jos. J. Geary, all of San Francisco, Cal. (Gilbert C. Wheat, of San Francisco, Cal., of counsel), for appellants.

Resleure, Vivell & Pinckney, of San Francisco, Cal., for appellees.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal in a case of collision between the sister cargo steamers, the Eureka and Ernest H. Meyer, shown by the evidence to have equal power and consequent speed in the conditions prevailing. The general factors controlling the problem of fault follow:

■ The collision occurred in San Francisco Bay, in the crowded thoroughfare between San Francisco and Oakland. There was no wind and no effective tide. There was a fog so dense that between 11 and 12 o'clock in the morning the visibility was as low as 300 feet and its maximum was 400 feet. In determining the speed of each vessel with reference to visibility in such a fog in a crowded harbor, they being such sister ships, each is entitled to no more than half the area of visibility in which to stop.

"It has been said by this court, in respect to steamers, that they are bound to reduce their speed to such a rate as will enable them to stop in time to avoid a collision after an approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law." The Chattahoochee, 173 U.S. 540, 548, 19 S.Ct. 491, 494, 43 L.Ed. 801; The Lepanto (D.C.) 21 F. 651, 659; The Old Colony (D.C.) 52 F.(2d) 992, 993, 994.

The length of each steamer was 300 feet, and hence the speed of either was excessive if she could not be stopped in 150 feet, or half a ship's length with the visibility at a minimum, and 200 feet when at its maximum. A "slow" bell on each vessel gives 5¾ knots. This speed is claimed as to each vessel in causative movements of their maneuvers, that is to say, upwards of 575 feet in a minute. The parties properly assume it would take at least half of a minute to cut over the steam into a full reverse. In that time the vessel would travel at least 250 feet before her propeller began to stop her and thereafter much more than a ship's length before she was dead in the water. This, and the testimony of the experts that at 6¼ knots the vessel would travel three ship's lengths before a full reverse would bring her dead, compels the finding that even a 4-knot speed would be immoderate. The facts do not require us to consider the Eureka's contention that as low as 2-knot speed is the "moderate speed" for the circumstances.

■ *The Meyer Was In Fault.* The District Judge found the Meyer in fault for excessive speed and failure to stop engines under Inland Rule 16 (33 U.S.C.A. § 192). In his consideration of the evidence he properly weighed it in connection with the presumption that the unsatisfactorily explained absence "of the 'Meyer's' smooth deck log, rough engine room log, engine room bell book and deck bell book" required the "conclusion that had these records been produced they would have shown facts adverse to the 'Meyer's' case."

Even if, as we did in The San Rafael, 141 F. 270, 275, 281, we regard the decree below as "vacated" and view the facts without considering the findings, our independent findings on the facts, based on a

review of all the facts and including the presumption arising from the unsatisfactory explanation of the nonproduction of the ship's logs, are that the Meyer failed to stop engines and maintained excessive speed in violation of Inland Rule 16 (33 U.S.C.A. § 192), and that these faults proximately contributed to cause the collision.

*The Faults Claimed against the Eureka.* The findings below are that the Eureka was free of fault, and the decree exonerates her from liability. The Meyer claims the Eureka was guilty of the same faults as those found against the Meyer, and that the District Court erred in not so finding. It also complains that, although the Eureka's engine room scratch log of first entry of the bells from the bridge was obviously and prejudicially altered as to bells controlling the speed of the Eureka in her immediate approach to the Meyer, the District Court ignored the alteration and failed to consider the evidence against the Eureka in connection with the same presumption as it did against the Meyer.

The first question which faces the Meyer is the effect of the findings upon which the decree of the District Court is based. We are required to consider how the position of appellate litigants here has been affected by Admiralty Rule 46½ (28 U.S.C.A. following section 723), promulgated by the Supreme Court in October, 1930, requiring in admiralty cases specific findings of fact by the District Court. If, since that rule was promulgated, we are required merely to determine whether there is sufficient evidence from which rationally may be drawn the particular inference embodied in the finding, and to ignore any other rational inferences, then we must affirm. Since this is a possible interpretation of the recent decision of the Supreme Court in McCrea v. U. S., 294 U.S. 382, 383, 55 S. Ct. 443, 79 L.Ed. 933, it is proper that we review the cases determining the character of trials of fact in admiralty appeals.

The last case considered by the Supreme Court which arose prior to the effective date of Rule 46½ is Brooklyn Eastern Dist. Terminal v. U. S., 287 U.S. 170, 176, 53 S.Ct. 103, 105, 77 L.Ed. 240. There, in a trial de novo, the Supreme Court weighed the evidence as on a new trial and found that the District Court's finding of the amount of demurrage was excessive. This finding agreed with that of the Circuit Court of Appeals (54 F.(2d)

978). The Supreme Court sustained the decree of the latter court ordering the District Court to enter its decree on the basis of its finding. The language of Justice Cardozo's opinion considering the nature of a new trial in the Circuit Court of Appeals is as follows: "In admiralty an appeal to the Court of Appeals is deemed to be a trial de novo. Munson Steamship Line v. Miramar Steamship Co. (C.C.A.) 167 F. 960; Gilchrist v. Chicago Ins. Co. (C.C.A.) 104 F. 566, 571; cf. The Abbotsford, 98 U.S. 440, 25 L.Ed. 168; Watts, Watts & Co. v. Unione Austriaca di Navigazione, 248 U.S. 9, 21, 39 S.Ct. 1, 63 L.Ed. 100, 3 A.L.R. 323; Standard Oil Co. v. So. Pacific Co., 268 U.S. 146, 155, 45 S.Ct. 465, 69 L.Ed. 890. An assessment of damages may be corrected if erroneous in point of law, but also it may be corrected if extravagant in fact."

The first case his opinion cites, Munson Steamship Line v. Miramar Steamship Co., is the leading authority on the nature of the new trial in admiralty appeals to the Circuit Court of Appeals. While it arose in the Second Circuit, its conclusions were applied to the Ninth Circuit in Langnes v. Green, 282 U.S. 531, 51 S.Ct. 243, 75 L.Ed. 520, where the court concurs with the language of Mr. Chief Justice White in Reid v. Fargo, 241 U.S. 544, 548, 36 S.Ct. 712, 60 L.Ed. 1156, that its review of the authorities was "full and convincing."

Upon the review of the authorities, Judge Ward's opinion in the Munson-Miramar Case holds: *"That this court stands with relation to the District Court exactly as the Supreme Court before the act of 1875 stood in relation to the Circuit Court. The appeal is still a new trial in this court, subject to the regulations before mentioned."* (Italics supplied.) Munson S.S. Line v. Miramar S.S. Co. (C.C.A.) 167 F. 960, 964.

The regulations referred to were rules requiring assignments of error and providing discretionary allowance of new pleadings and evidence in the appellate court. Among the cases relied on in Judge Ward's review of authorities is Chief Justice Marshall's opinion in Yeaton v. U. S., 5 Cranch, 281, 3 L.Ed. 101, in which the Supreme Court held that the admiralty appeal "suspends" the decree below, and the case of Post v. Jones, 19 How. 150, 160, 15 L.Ed. 618, where the Supreme Court, in disagreement with both the Circuit Court and District Court, in-

creased an award to salvors, saying that the court must give its "conscientious judgment * * * on every question arising in the cause." Judge Ward's opinion further relies on Irvine v. The Hesper, 122 U. S. 256, 7 S.Ct. 1177, 30 L.Ed. 1175, holding that on an admiralty appeal the decree below is "vacated altogether."

This court, in an earlier case in an opinion by Judge Ross, held that on an appeal from a limitation decree that decree was "vacated." One McHugh, who had not appealed, was allowed to appear in this court which reviewed the evidence without regard to the finding below and raised his award for personal injuries from $1,000 to $5,000. The San Rafael (C.C.A.) 141 F. 270, 275, 281.

It will be noted that in none of these cases is any distinction made between reviewing the decision of the lower court on facts where the evidence considered below is given in open court and where it consists of depositions.

As significant as is his reliance on the Munson Steamship Case is Justice Cardozo's citation to the specific page in Gilchrist v. Chicago Insurance Co., 104 F. 566, 571, where the Circuit Court of Appeals held that, under the act of 1891 (26 Stat. 826) "an admiralty appeal by the libelant in the circuit court of appeals * * * is to be heard and determined under substantially the same rules and limitations that regulated the determination of admiralty appeals in the circuit courts prior to the passage of that act. It results that this court may properly consider and determine every issue raised by the pleadings, and, *without regard to the decree below,* direct such a decree to be entered here as is consistent with law. If, in our judgment, the libelants are not entitled to a decree in any amount * * * we may dismiss the libel, notwithstanding the underwriters did not themselves directly appeal from the decree." (Italics supplied.) This decision in the Gilchrist Case, so cited in Justice Cardozo's opinion, in turn relies on The Lucille, 19 Wall. 73, 22 L.Ed. 64, where the Supreme Court held: "An appeal in admiralty has the effect to supersede and vacate the decree from which it is taken. A new trial, *completely and entirely new,* with other testimony and other pleadings, if necessary, or if asked for, is contemplated,—a trial in which the judgment of the court below is *regarded as*

*though it had never been rendered."* (Italics supplied.)

By the acts of Congress, the Supreme Court between 1789 and 1803 (1 Stat. 73, 83; 2 Stat. 244) and between 1875 and 1891 (18 Stat. 315; 26 Stat. 826) was required to review admiralty causes only as on writ of error, and, so far as the evidence was concerned, which was required to be in a bill of exceptions, it received the limited consideration accorded to a review of a case at law. The decisions in the Yeaton, Post, and Lucille Cases before cited were rendered in the period between 1803 and 1875 when the Supreme Court reviewed admiralty causes on true appeals. Under the rule established in Munson S.S. Line v. Miramar S.S. Co., accepted by the Supreme Court in 1930, in Langnes v. Green, and in 1932 in the Brooklyn Eastern Dist. Terminal Case, they are relevant to a consideration of function of this court in an admiralty appeal at least until Supreme Court Admiralty Rule 46½ was accepted.

In October, 1930, the Supreme Court promulgated Admiralty Rule 46½ as follows:

"In deciding cases of admiralty and maritime jurisdiction the court of first instance shall find the facts specially and state separately its conclusions of law thereon; and its findings and conclusions shall be entered of record and, if an appeal is taken from the decree, shall be included by the clerk in the record which is certified to the appellate court under rule 49."

It is apparent that the requirement for such findings must mean that the decree of the District Court has some significant effect; that it is not to be regarded as vacated; and that the new trial in a Circuit Court of Appeals cannot now regard a decree based on such findings as though "it had never been rendered."

The recent case of McCrea v. U. S., 294 U.S. 382, 383, 55 S.Ct. 443, 79 L.Ed. 933, decided February 18, 1935, reviews District Court finding (3 F.Supp. 184) made under the new rule. In that case certiorari had been granted (294 U.S. 23, 55 S.Ct. 291, 79 L.Ed. 735) and the Supreme Court had sustained the decree of the Circuit Court of Appeals (70 F.(2d) 632) adversely to the petitioner who as libelant had been denied his claim for double wages under Rev.St. § 4529, as amended by section 3 of the Seamen's Act of

March 4, 1915, c. 153 [46 U.S.C.A. § 596]. Petitioner moved for reargument on the question of fact whether the failure to pay his wages was "without [the] sufficient cause" required by the statute. In considering the contention that the finding of the District Court that the failure to pay his wages was "without sufficient cause," the Supreme Court states:

"In its brief it specifically relied on the finding of the District Court that petitioner had abandoned the vessel two days after arrival, and cited the record in support of the finding. Petitioner in this Court neither *challenged the finding of the District Court* nor *assailed the sufficiency of the evidence* to support it, and we are now asked, for the first time, by a motion for reargument, to weigh the evidence.

"The petitioner, in his testimony in his own behalf, both on direct and cross-examination, testified at four different points in the record that he abandoned the vessel on February 28th, which was on Tuesday, two days after arrival. He identified the day of abandonment by its date, as being on Tuesday, and as being the day after his visit to the Consul's office, which was on Monday, February 27th. He was equally specific in his testimony that when he left the vessel he did not intend to return and did not in fact return. We accept his testimony as correct and *as abundantly supporting the finding of the District Court.*

"We *also* think, as the opinion indicates, that petitioner's departure from the vessel, whenever it occurred, without informing the master whether he persisted in his demand, *precludes the inference that,* in the circumstances, the failure to pay wages was 'without sufficient cause.'" (Italics supplied.)

From the above it is clear that the Supreme Court regards the findings of the District Court as something which may be "challenged" in the Circuit Court of Appeals, and in the determination of that challenge the Court is required "to weigh the evidence." When the evidence is weighed, it is weighed with a view to determining whether it is of a "sufficiency" to support the findings. In this case, the Supreme Court found, first, petitioner McCrea's own testimony "as abundantly *supporting* the finding of the District Court," and, second, "also" that petitioner's evidence *"precludes* the inference that, in the circumstances, the failure to pay wages was 'without sufficient cause.'"

It is arguable that the Court means that there is a difference between a "sufficiency of the evidence to support the findings" and the evidence which "precludes" an inference that any other finding has support in the evidence; that the first means that, if there are several inferences from the evidence, the appellate court is confined to that one found by the court below if it can be supported, and that it can be set aside only if there is but one inference and that one precludes the correctness of the challenged finding; that because on writ of error a finding must not be disturbed if there is a sufficiency of the evidence to support it, the same rule now governs admiralty appeals; that, when we "weigh the evidence," we find the scales tipped in favor of the appellee when the record discloses sufficient evidence from which the trial court could make the particular inference in its finding: that is, that we need not weigh the *whole evidence* and draw our own inferences as to whether it "makes manifest" that some different finding should be made. In other words, that, by the promulgation of Rule 46½ requiring findings, the Supreme Court has converted the admiralty appeal into a proceeding in effect as on writ of error.

It is difficult to believe that, after our broad power in new trials in admiralty appeals recognized by the Supreme Court in 1932 in Brooklyn Eastern Dist. Terminal v. U. S., supra, that Court, without even mentioning in the McCrea Case that it is considering any change in the new trial as effected by Rule 46½, there intended to hold that new trials had been abolished and that we should consider the case as if brought here by writ of error. Until in this or some other case the Supreme Court shall clear up the doubt, we therefore adhere to the rule as stated in The Andrea F. Luckenbach (C.C.A.) 78 F.(2d) 827, 828, as follows: "The well-established rule is applicable that the decision of the trial court in admiralty cases upon controverted questions of fact will not be disturbed by the appellate court unless clearly against *the weight* of the evidence."

In so weighing the evidence it is not weighed with the end in view of determining whether a part of the evidence warrants an inference supporting the finding. We must weigh *the whole evidence.* We so understand the recent opinion in The Mauretania (C.C.A.2) 80 F.(2d) 225, 228, when he speaks of our going "at large into

the evidence" to determine the correctness of the findings and of the value of the District Judge's decision as "the *aid* to be derived from his consideration of the facts and the law." Cf. The Mabel (C.C.A.9) 61 F.(2d) 537, 540.

■ In such weighing of the evidence we are required to make our independent "examination, thought and judgment" just as did the Supreme Court in The Ariadne, 13 Wall. 475, 479, 20 L.Ed. 542, one of the last Supreme Court cases before the Act of 1875 abolishing trials de novo in admiralty appeals. There, in reversing where both the District Court and Circuit Court had made the same finding as to fault in a collision case, the Court holds the rule in admiralty appellate new trial to be as follows:

"We are not unmindful that both the Circuit and District Court came to a conclusion different from ours as to the alleged fault of the steamer.

"Their judgments are entitled to, and have received, our most respectful consideration. Their concurrence raises a *presumption, prima facie, that they are correct.* Mere doubts should not be permitted to disturb them. But the presumption referred to *may be rebutted.* The right of appeal to this court is a *substantial right,* and not a shadow. *It involves examination, thought, and judgment.* Where our convictions are clear, and differ from those of the learned judges below, we may not abdicate the performance of the duty which the law imposes upon us by declining to give our own judicial effect." (Italics supplied.)

This is the approach to the specific provision of Admiralty Rule 43½, promulgated in 1932, 28 U.S.C.A. following section 723, that the findings of a commissioner should be treated as "presumptively correct," made by the Second Circuit in The Russell No. 3 (C.C.A.) 82 F.(2d) 260, 263. There Judge Learned Hand's opinion, speaking of the commissioner's finding, says: "While it is entitled to be treated as *'presumptively* correct' (Admiralty Rule 43½, 28 U.S.C.A. following section 723), there is a point *after which we must assume responsibility for the facts;* we think this is such a situation, and we hold the claimant liable for the break of the fluke requiring a new propeller." (Italics supplied.)

Pursuing the principle of the Ariadne thus controlling the Supreme Court, we weigh the evidence in an admiralty new trial with the rebuttable "prima facie" presumption that the findings of the District Court are correct, just as any trial court weighs evidence where a presumption has been established. The value of this presumption in determining the total weight of the evidence is affected by the amount of testimony below which was actually heard by the court, and the amount, if any, in depositions. Where all of the evidence is heard by the trial judge and the question is one of credibility of witnesses on conflicting testimony, the presumption has very great weight.

■■ It is obvious that, where the testimony is in part in deposition and in part heard by the court, and the conflict is between the heard and unheard witnesses, there cannot be a balancing of credibility between the two. In such a case, and where all or substantially all of the evidence pertinent to the finding is given by deposition, the presumption is of lesser weight and more easily may be rebutted. The Natal (C.C.A.9) 14 F.(2d) 382, 384: "The rule that findings of fact are entitled to great weight in an appellate court is modified where, as here, they are based wholly upon depositions." U. S. v. Los Angeles Soap Co. et al. (C.C.A.9) 83 F.(2d) 875, decided May 14, 1936.

In this case the evidence of all the officers and crews of both vessels, testifying to their control of their respective movements toward the collision, is by deposition. The presumption supporting the findings below, therefore, has the slight weight described in The Natal, supra.

*The Eureka Violated Rule 16 in Failing to Stop Engines and Proceed with Caution and in Entering Visibility at Excessive Speed.* The evidence has the usual contradictions. We are even told of the "bone in the teeth" of a small freighter at 6 knots in calm waters.

The Supreme Court advises that even passengers are not immune from a "loyalty to the ship," prejudicial to an accurate memory of her misdoings. Although my concurring brother does not accept the analogy, it may be suggested that, when her virtue is questioned, some of the participants in her conduct feel an unwarranted obligation to testify "like gentlemen" in her behalf. The reports show many col-

lision cases presenting complete contradictions of the same events, crew against crew.[1] Few would receive just consideration were we to permit ourselves the crescendo of judicial irritation culminating these successive torsions of veracity. In this case my dissenting brother would go so far as to deny all relief. I find the authorities later cited, including this circuit, do not support such an extreme ruling. The contemporaneous entries of the scrap deck and engine room logs, particularly those made when unconscious of any impending danger, have potent evidentiary value. In part, for the reasons suggested, arise the presumptions from the alterations by erasures of entries in the scrap log of acts in the claimed causal chain to the collision and from their nonproduction. Upon these and the unconscious or reluctant admissions against the ship many cases must be decided.

The Eureka's mate, who was on the forecastle head during the trip from San Francisco, testifies to hearing fog whistles of the Meyer two or three minutes before she became visible, and the Meyer claims the Eureka, at that point, was proceeding under a slow bell at 5¾ knots speed and failed to stop engines.

The Eureka's engine room scratch log, altered by erasure in the six-minute period before the collision, becomes of importance. When the bells just prior to a "full ahead" on seeing the Meyer were entered, there was no reason for confusion or excitement in the engine room. There had been many stop, slow, and half speed bells during the prior forty minutes. Yet we find that there had been a vigorous attempt to erase the bell entry controlling the speed at visibility and to substitute one which would indicate that the Eureka at the point of visibility was almost dead in the water.

It is agreed that, when the Eureka saw the Meyer, she went full ahead. Her engine room scrap log shows this at 11:55. It is preceded by a "stop" in the same minute. The captain's description of the time interval makes it very short. There could be no appreciable slowing of the Eureka by reason of the stop at 11:55.

The first entry before 11:55 was a slow ahead bell. It was altered by erasure and superscription to be 11:54. The alteration was with a different lead. It must have been at a different time, for the engineer on watch says the pencil used by the second assistant in making the entry had no eraser. The second assistant says the superinscribed number was not made by him.

The hour number 11 was unchanged. Under the 5 of the 54 clearly appears the impression of a 4, showing the original entry was in the period between 40 and 50. Under the crossing of the horizontal and vertical lines of the 4 of the superimposed 54 appears a faint curving marking where there would necessarily have been an erased 9. We say necessarily, because, since the next preceding entry, an original, was 11:49, the erased entry must have been after it and before 11:50. All this is apparent to the naked eye.

This interpretation of the entries is confirmed by the Eureka's witness, a fireman, who went on duty just before 11:50. He says at this time there was a stop succeeded by a slow ahead in a few seconds, and that for most of the time between then

---

[1] Each brief asserts, and the testimony offered by each vessel was, that she was dead in the water. Eureka, p. 131; Meyer, pp. 384, 412, 603. This is not determined by the approach of the opposing vessel or by the new inventions referred to in the concurring opinion. There is not here involved the difficulty, stated in the concurrence and familiar to all admiralty practitioners, of ascertaining the relative speed of two moving vehicles by a person on one of them.

Whether either was dead in the water was here to be determined under a midday California sun over a fog with 400 feet visibility, by the water next the vessel, the wash of her propeller, and the knowledge of her preceding speed. Obviously, if both were dead, the collision could not have occurred. The dead in the water testimony showed one or the other of the ships was offering the court an untruth. This was but one of similar offendings.

The judicial silk does not dehumanize its occupants (see the opinions of the Chief and other Justices in recent constitutional cases). An American admiralty tribunal should not remain placid in the presence of such testimony and forged logs, even if, in the words of the concurrence, the record shows this "the ordinary case." Because one's knowledge of the sea's traditional loyalties may aid in understanding such conduct, it should not be condoned. In this particular case, did not the authorities seem otherwise, Judge GARRECHT'S solution denying relief to both parties would have been that of a majority.

and the collision at 11:56 the vessel was proceeding at slow ahead.

The Eureka's fireman testified as follows:

"Q. When you went on watch at 11:50 did you pass through the engine-room on your way into the fire-room? A. I did, I went through the engine-room.

"Q. Did you notice the condition of the engines at that time, as to speed? A. The engine was stopped when I came down.

"Q. How long, if you know, did the engines remain stopped after you got there? A. It is hard to tell, but it was only a few seconds; *it only was stopped for a few seconds.* Then I went to the fire-room and *then they ordered slow ahead again.* * *

"Q. Do you remember any stops from the time you went in the fire-room to the time that you got that full ahead just prior to the collision? Do you remember any period of stops? A. We were going slow mostly all the way up right along."

This was convincing testimony against his ship, and counsel attempted to defeat it by a highly improper leading as follows: "Q. Do you remember a stop for about four or five minutes? A. Yes, I do."

In the subsequent examination, the fireman returned to his first statement. The testimony is:

"Q. Was that stop at the time you came into the fire-room—* * * A. (continuing). We got slow ahead and then full astern, and then they came."

Obviously here was something to be cleared by the parties faced with this challenge to the altered entries in the log. The Eureka's proctors started to clear this hurdle, but balked at the jump:

"Q. On my direct examination you testified that after you went on watch, but before the collision, you remembered a five-minute stop of the engines, a four or five-minute stop. A. Yes, sir.

"Q. Does that refresh your recollection at all as to how long the engines were stopped after you came on watch?

"Proctor for Meyer: I object to the question as already asked and answered.

"The Court: *I will allow the question.*

"Proctor for Eureka: *I will withdraw the question, your Honor.*"

We find that the original entry was a slow ahead bell at 11:49.

The two preceding bells were slow ahead at 11:40 and a stop at 11:49. The slow ahead for nine minutes gave the Eureka a 5¾-knot speed. The stop and renewal of the slow ahead, both in the minute 11:*49*, would give her a 5¾-knot speed by 11:51 and from there to the stop and full ahead just before the collision.

The Eureka's captain says the undisputed stop engines at 11:49 was not for the Meyer, but because of a whistle ahead from a ferry and a tug and tow. However this may be, it was gross fault, in violation of Rule 16, to proceed ahead at 5¾ knots speed toward the unascertained vessels, whatever they may have been.

The captain, who was on the bridge throughout these maneuvers, asserts that the stop in 11:55 was not for any whistle from the Meyer, but because she was reported as seen. He says he never heard any Meyer whistle except her three reversing blasts just as she emerged into sight.

We must then conclude that the mate on the Eureka's forecastle head did not report to the bridge the Meyer's fog whistle heard two or three minutes before she was seen. However this may have been, the fact is that the lookout mate was as much the ear of the Eureka as the captain. The Eureka heard the Meyer's fog whistle coming from an unascertained position forward of her beam. She did not stop engines, and hence violated Rule 16. She continued ahead toward the opposing vessel, not only without caution as that rule also requires, but at an excessive speed in violation of good navigation.

Some of the Eureka's witnesses testify she was practically dead in the water when the Meyer was seen—this must necessarily have been so if she had remained stopped from 11:49 to 11:55 as shown by the altered log. However, they are contradicted by Second Mate Melder on the bridge, who admits the Eureka had steerage way at that time. They are contradicted by all the witnesses on the Meyer, whose testimony shows excessive speed on the Eureka when she loomed out of the fog.

■ Erroneous scratch log entries are properly corrected where the original entry is left clear. That it is wrong to erase entries is a matter of common knowledge among ships' officers. The historic requirement for the keeping and production of an accurate record of the ship's naviga-

tion orders and maneuvers and the admiralty courts' insistence on the integrity of such a record has been long established. Concerning the penalty for deceptive alteration, Judge Benedict in The Tillie, 23 Fed.Cas. page 1266, No. 14,048, has taken the extreme view: "If possible, *it ought never to happen that a case sought to be supported by a fabricated log-book should succeed;* and while charges of this kind are not to be listened to unless based upon strong evidence, if they are supported by testimony and remain unanswered on the evidence, they *compel* an adverse decree." (Italics supplied.)

I cannot agree with the dissent that this statement has become a classic, if by this is meant an accepted authority in any court, including this. On the Tillie appeal Judge Benedict's rule was not affirmed. On the contrary, Circuit Judge Hunt, instead of holding that the suspicious character of the logbook defeated the right of a defense to the steamship producing it, merely rejected it. He says: "The testimony afforded by a log-book is usually entitled to much respect. The log-book of the Tillie, offered in evidence, is surrounded by so much doubt, and, to use a mild term, so many mistakes and discrepancies in relation to it are presented, and its internal appearance is so suspicious, that it must be entirely rejected." 23 Fed.Cas. page 1267, No. 14,049. He then proceeds to analyze the other evidence of the faults of the steamship and bases his decision on that evidence.

However, the result here is that in neither case does the attempt to show absence of fault succeed when "supported" by the logbook or where it is not produced. In each it determined the liability of its producer or nonproducer to the *opposing* party; that is to say, each failed in its act of production or nonproduction, but succeeded by such action on the part of its opponent.

In the Corinthian, 11 Asp.M.C.(N.S.) 208, 211, the English Judge says: " * * * Once you find there has been tampering with a log, as I have had occasion to say before in other cases, the court at once looks with suspicion at the whole matter."

■ District Judge Holt, afterwards Circuit Judge, whose reputation as an admiralty judge is evidenced by the Supreme Court's repeated reliance on his opinion in the Munson-Miramar Case, supra, states the penalty for purposeful alteration as follows: "The legitimate *inference* in all such cases is that, if the true facts were entered in the log, they would be unfavorable to the vessel." (Italics supplied). The Sicilian Prince (D.C.) 128 F. 133, 136, 137.

This circuit in the case of Cary-Davis Tug & Barge Co. v. U. S. (C.C.A.9) 8 F.(2d) 324, 325, has accepted this statement of interpretation of altered logs by Judge Holt. It is this *"inference"* we have applied in solving this case.

■ Our independent judgment on the whole record causes us to find the Eureka violated Rule 16 with respect to her failure to stop and to proceed with caution, and also violated the moderate speed rule, and that these violations were proximate contributing causes of the collision. In weighing the evidence and reaching this conclusion, we have given the presumption of correctness attributable to the findings below less than the ordinary weight. This is because the absence of the Meyer's log is made the basis of a presumption relied on in the decision below, but that decision does not mention the alteration of the Eureka's·log, although it is obvious the testimony regarding it is conflicting and suspicious, and although the matter was vigorously presented in the cross-examination.

Since both vessels were in fault for the collision, the District Court should ascertain the damages and enter the appropriate decree.

Reversed.

WILBUR, Circuit Judge (concurring).

I concur with Judge DENMAN except as indicated.

In considering the testimony of witnesses aboard two ships approaching each other in a fog so dense that they are invisible until within 400 feet of each other, it is impossible for observers aboard ship without the use of navigation instruments such as a stadimeter, or range finder, to accurately judge the speed of the approaching vessels. Furthermore, unconsciously the speed of approach is attributed to the other vessel rather than one's own. In dealing with the speed of his own ship, a witness may have the advantage of the knowledge of the progress of the ship as it has approached the point of visibility. This knowledge includes the speed shown by the patent log, the speed of the propeller, the variations of that speed, the

knowledge of progress made over the ground as shown by soundings taken by fathometer or otherwise, and by the time of passing bell buoys, foghorns, and other navigation aids, assisted also in some instances by echo from the near shore, by radio compass, etc. From these factors the navigation officers of the ship are able to determine the speed of their ship at a given time with great accuracy. The casual observer aboard ship, however, has little to aid him in judging speed other than the vibration of the ship which indicates with some degree of accuracy the speed of the propeller and the observed speed of the ship through the water, with reference to floating objects or bubbles.

Some of the witnesses in the case at bar testified to their judgment as to the speed of the ship through the water.

· The effort to deduce the speed of the approaching ships from the testimony of those who have merely observed the approach and who base their judgment as to speed upon their own unaided observation is so difficult and uncertain that a definite conclusion therefrom is well-nigh impossible. In this situation, as Judge DENMAN points out, the records of the ships with relation to their progress up to the time of collision is of primary importance.

I do not agree with the paragraph in Judge DENMAN'S opinion dealing with the prejudice arising in the minds of witnesses because of their alleged loyalty to the ship. Nor do I recognize any reason for irritation in the approach to the problem presented by this case. It seems to me to be the ordinary case requiring the weighing of the testimony of fallible human beings according to accepted legal standards. This is an everyday experience in the courts.

GARRECHT, Circuit Judge (dissenting).

Scarcely exaggerated is the statement of counsel for the appellees that the respective parties are in agreement only as to the names of the colliding vessels, the time of the collision, and the existence of fog. The fog that enveloped San Francisco Bay on the late autumn morning in question seems to have been wafted into the record. Not only are all of the material facts in sharp controversy, but added to the welter of dispute are the admitted disappearance of the Meyer's engineroom bell book, smooth deck log, and rough engine-

room log, and the admitted alteration of the Eureka's engineroom bell book.

The parties agree that ships' records are of great importance in a collision case, especially where the question of speed is involved.

In the majority opinion, an attempt is made to reconstruct the admittedly altered logbook of the Eureka. Ingenious and plausible as the reconstruction may be, I cannot bring myself to accept it as a substitute for legal evidence, properly introduced. I do not believe that it is the province of an appellate court, even in admiralty, to perform the task of a handwriting expert, and, scrutinizing a document with a microscope, decide what the original entry may or must have been. To my mind, such a procedure substitutes conjecture for legal evidence.

The majority of the court seems convinced, as I am, that the disappearance and the alteration of the logbooks have not been satisfactorily explained. In such a situation, a court of admiralty, acting as it does according to "the principles of equity rather than the strict rules of common law" (1 C.J. 1252, § 18), should decline to give relief to parties whose records have vanished or have been altered.

I also agree with my brethren that "many collision cases present complete contradictions of the same events, crew against crew." For this reason, I cannot concur with the majority in its reliance upon oral testimony in order to clarify a situation so unfortunately confused by the disappearance and alteration of records.

I am in complete agreement with Judge Benedict's classical statement that: "If possible, it ought never to happen that a case sought to be supported by a fabricated log-book should succeed." The Tillie, 23 Fed.Cas. page 1266, No. 14,048. The majority opinion brushes aside this statement with the comment that it expresses "the extreme view." Whether extreme or not, this view seems to me less productive of possible injustice than a reliance upon guesswork as to what a ship's record may, might, or must have been before it was mysteriously altered or destroyed. While I do not impugn the motives of any of the proctors connected with the case, the stubborn fact remains that the parties have placed themselves in so dubious a situation as to disentitle them to relief from a court of admiralty.

Aside from the logbooks, which are admittedly of crucial importance, the other evidence relied upon to establish fault is too tenuous and conflicting to provide a substantial basis for a decision.

Accordingly, I am reluctantly compelled to differ with my brethren and to hold the view that neither party should be given relief, and that each side should bear its own costs, here and below.