652

THE KOYEI MARU. *

THE DAVID P. FLEMING.

THE P. S. B. & D. CO. NO. 13.

THE PIONEER NO. 11.

THE W. T. CO. NO. 14.

TAKACHIHO SHOSEN KABUSHIKI KAI-SHA, Limited (UNITED OCEAN TRANS-PORT CO.) v. WILMINGTON TRANSP. CO. (two cases).

PACIFIC VEGETABLE OIL CO., Inc., v. SAME.

No. 8306.

Circuit Court of Appeals, Ninth Circuit.

May 3, 1938.

Farnham P. Griffiths, of San Francisco, Cal., and Harold A. Black and McCut-

*Rehearing denied June 22, 1938.

chen, Olney, Mannon & Greene, all of Los Angeles, Cal., for appellant Takachiho Shosen, etc.

Alfred T. Cluff and Sawyer & Cluff, all of Los Angeles, Cal., for appellants Pacific Vegetable Oil Co. et al.

Ira S. Lillick, H. R. Kelly, John C. McHose, and Lillick, McHose & Adams, all of Los Angeles, Cal., for appellee.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This appeal involves liability for a collision between the Japanese motorship Koyei Maru and one of three scows in tow of the tug David P. Fleming in the international waters just outside of San Pedro Harbor, California.

The owner of each vessel libeled the other, and, in addition, cargo interests on the Japanese freighter libeled the tug. The court found the Koyei Maru solely at fault and decreed accordingly. On her appeal the Koyei Maru urges: (1) That the Fleming be found solely at fault; or (2) in any event, in contributive fault, and the damages divided.

The Koyei Maru is a 10,000-ton, 450-foot over-all vessel, capable of 15 knots at full ahead. At 2:04 a. m., the night being clear, but with a murky horizon, she was proceeding southeasterly out of Los Angeles Harbor at a speed of 10 knots.

Proceeding southerly and extending as a network across the mouth of the harbor and about a half mile from the entrance were the Fleming and her tow of three scows. The area covered by tug and tow was the sum of the tug's length, 75 feet; 1,200 feet to her first barge, 110 feet in length; then 600 feet to the next barge, 130 feet in length; and then 600 feet to the last barge, 110 feet in length—in all 2,-825 feet, well over half a land mile.

The lights on the tug violated the International Rules in a manner later considered. Each barge exposed a green light towards the harbor entrance, but they were very close to the water line, and, in the prevailing atmospheric conditions, they may have shown as the white lights of the fishing fleet which operates off San Pedro Harbor to supply San Pedro's great fish canning and processing plants.

It was admitted that the jetty construction, to which the barges supplied stone from Catalina Island, permitted a continuous use of the barges between the Island and the jetty, if they passed the harbor in the daylight of late afternoon and early morning.

In view of these facts we find that the tug with its long tow was conducting an operation unnecessarily dangerous to the vessels emerging from San Pedro, the port of Los Angeles, with the largest or next to the largest entering and departing tonnage of any port on the eastern littoral of the Pacific north of Panama.

■ The tug's violation of the International Rules consisted in exposing astern a range light which should have been screened to cast its light only forward of two points abaft her beam. International Rules, art. 2, 33 U.S.C.A. § 72.

Since she also had a stern light, it is apparent that any one seeing the two lights would assume that there was a single tow abaft the towing lights; that is extending in and proceeding in a direction opposite to that of the three barges of the Fleming's tow. He would assume contrary to the fact that the tow consisted of one and not three vessels, and hence, if he saw one vessel in tow, it was safe to pass astern of her. Article 3, 33 U.S.C.A. § 73.

Such a violation of the express provisions of the International Rules imposes on the tug the extraordinary burden of proof of the Pennsylvania and Beaver cases, The Pennsylvania, 19 Wall. 125, 136, 22 L. Ed. 148; Lie v. San Francisco & P. S. S. Co., 243 U.S. 291, 298, 37 S.Ct. 270, 61 L. Ed. 726.

The testimony is contradictory as to whether the Koyei Maru saw the green light of the tug, but we accept the tug's contention that it was on such a course that it was impossible for anyone of the steamer to have seen it. In this situation the burden on the tug is to show that its false tow light not only did not cause but could not cause any confusion in the mind of the navigator on the steamer which contributed to the collision. The testimony affirmatively established that the Koyei Maru's navigator was confused by the tug's lights, and we cannot find that this confusion did not contribute to the collision.

■ Since the tug admits the condition of its lights, and the evidence of their effect on the minds of those on the Koyei Maru is by deposition, the presumption supporting the court's finding in favor of the tug is of slight weight. Broughton &

Wiggins Nav. Co. v. Hammond Lumber Co., 9 Cir., 84 F.2d 496, 501.

The Koyei Maru's master had seen the tug's two lights on his right bow, not as two lights or as a sharp single light, but as a blur of light. He was proceeding at about 7 knots speed when the blur disclosed its two lights indicating a tow of a single vessel. The first tow loomed up ahead and he reversed full and gave his vessel a helm to cause her diminishing momentum ahead to take her astern of the barge, not realizing the tow line to the second barge, 600 feet astern. Suddenly seeing the unexpected second barge, with the certainty of fouling her tow line, he dropped his anchor, but he still had enough ahead momentum, which, combined with that of the second barge, caused it to collide with the steamer. We find that the tug was in fault and that it contributed to the collision.

On the other hand, the evidence sustains the District Court's finding that the Koyei Maru was in causative contributive fault with regard to her lookout and her failure to stop her engines at once when the unexplained several lights were seen off the harbor's entrance. The chief officer was the lookout at the Koyei Maru's bow, some 200 feet forward of the captain on the bridge. Since he says that the night was generally clear but somewhat murky, causing the green lights to appear to him to be white, he was not entitled to assume that those on the bridge, 200 feet further away from lights the vessel was approaching, would see any of them at the same time he did. Yet the evidence shows that though he was nearer, those on the bridge saw the barge looming ahead before the lookout reported it.

This inattention seems explained by his testimony:

"Int. No. 6. Was any other work such as arranging lines, or derricks, or anything else, being done on the forecastlehead at about the time of the collision? Ans. No. 6. Yes.

"Int. No. 7. If so, explain in detail and state whether it was your duty to supervise that work. Ans. No. 7. I prepared two (large) cork fenders. It was my duty to supervise it." (Tr. 45.)

If, as claimed by the Koyei Maru, the cork fenders were being prepared to fend the vessel from the anchors thus to be dropped in extremis, it is an admission that the anchors were not ready for the instant action required in maneuvers entering or leaving or about harbors. We conclude, however, that the care of the cork fenders was not connected with the dropping of the anchors after the collision became imminent, but a prior occupation distracting to the lookout.

The chief officer had other duties to perform beside those of lookout. They were "standby" duties, which consisted in supervising anything necessary to make the vessel shipshape forward after her departure from her dock, a short time before. These were the mooring lines to be stowed as well as the preparation of the cork mats. The boatswain near the first officer was engaged in an unexplained operation of "doubling the screws of the anchor." Even if the chief officer had attended to none of the "Standby" duties on leaving the harbor, they were a charge on his mind as the crew worked on the matters to be done around him which disqualifies him as a free and single-minded lookout. It was proper for the District Court to make its finding of fault under the Ariadne burden of proof: "The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend. A moment's negligence on his part may involve the loss of his vessel with all the property and the lives of all on board. The same consequence may ensue to the vessel with which his shall collide. In the performance of this duty the law requires indefatigable care and sleepless vigilance. The rigor of the requirement rises according to the power and speed of the vessel in question. It is applied with full force to the steamships belonging to our commercial marine. If this were not so, there would be no safety for other vessels. But it is equally important to vessels of that powerful class for their protection from one another. It is the duty of all courts, charged with the administration of this branch of our jurisprudence, to give it the fullest effect whenever the circumstances are such as to call for its application. Every doubt as to the performance of the duty, and the effect of nonperformance, should be resolved against the vessel sought to be inculpated until she vindicates herself by testimony conclusive to the contrary." The Ariadne, 13 Wall. 475, 478, 479, 20 L.Ed. 542.

Four minutes before the collision the Koyei Maru's captain saw, in what he calls a murky horizon, the lights, the na-

ture of which were uncertain, but which he supposed were fishing lights. Instead of stopping her engines and proceeding on her diminishing 10 knot momentum until their nature was ascertained, he proceeded under a slow bell at a speed dropping from 10 to not below 7 knots. We agree with the District Court that this was negligent and contributive.

The decree is affirmed as to the fault of the Koyei Maru, and reversed as to the tug, with instructions to decree against the Wilmington Transportation Company for the fault of the tug; to divide the damages of the Takachiho Shosen Kabushiki Kaisha, Ltd., and the Wilmington Transportation Company; and to enter an interlocutory decree in favor of the owners of the cargo on the Koyei Maru with the usual order for ascertaining their damages. The costs on appeal are to be assessed in favor of the appellants.